# Wm. Drinkhouse's Est.  E. T. Drinkhouse's Appeal.

*Findings of fact by auditing judge—Review.*

The findings of fact by an auditing judge will not be reversed when based upon evidence sufficient to sustain the verdict of a jury.

*Evidence of marriage.*

The evidence in this case, showing courtship, declarations as to marriage, cohabitation, birth and parental care of acknowledged issue, was held sufficient to support a finding of marriage.

*Competency of wife to prove marriage.*

The wife is a competent witness to prove marriage with her deceased husband: Greenawalt v. McEnelley, 85 Pa. 352.

*Cohabitation—Meretricious cohabitation—Evidence.*

While satisfactory evidence that cohabitation had at any time been meretricious, will eliminate subsequent cohabitation as a fact from which marriage may be inferred, yet insufficient or indirect evidence of a meretricious cohabitation will not have such effect.

*Admissions of marriage—False statements.*

Admissions by one of the parties that a marriage had been made, when in fact no marriage had been contracted, while greatly weakening the force of subsequent admissions as an item of proof, will not have the effect of excluding them altogether, in an issue involving the legitimacy of acknowledged offspring.

Argued March 29, 1892. Appeal, No. 147, Jan. T., 1892, by Elizabeth T. Drinkhouse et al. from decree of O. C. Phila. Co., July T. 1879, No. 95, dismissing exceptions to the adjudication of account of the Phila. Trust, Safe Deposit & Ins. Co., trustee of the estate of William Drinkhouse, deceased. Before PAXSON, C. J., WILLIAMS, GREEN, MITCHELL and HEY-DRICK, JJ.

Claim to participate in distribution, as grandchildren and heirs of decedent.

The facts appear by the opinion of the Supreme Court.

The auditing judge, ASHMAN, J., after reviewing the evidence, recited in the opinion of the Supreme Court, found as a fact that the claimants were legitimate children of Joseph W. Drinkhouse, a son of decedent, and accordingly entitled to participate in the distribution. Elizabeth T. Drinkhouse, widow of Wm. Drinkhouse, and other heirs, filed exceptions, which were dismissed by the court, and the adjudication confirmed in an opinion by PENROSE, J. Exceptants thereupon appealed.

*Errors assigned* were, among others, the dismissal of the exceptions, quoting them.

*F. Carroll Brewster*, with him *Lincoln L. Eyre, Richard P. White*, and *Wayne MacVeagh*, for appellants.—The evidence shows illicit intercourse between the alleged husband and wife prior to their alleged marriage. The clearest evidence is necessary to establish an actual marriage under such circumstances; it cannot be inferred from cohabitation or mere reputation. It should be proved like other civil contracts: Com. v. Stump, 53 Pa. 136; Physick's Estate, 2 Brewster, 179; Bicking's Ap., 2 Brewster, 202; DeAmarelli's Est., Ibid. 257; Yardley's Ap., 75 Pa. 207; Cunningham v. Cunningham, 2 Dow P. C. 482; Green's Est., 45 Leg. Int. 174; Campbell v. Campbell, L. R. 1 Scotch Divorce and Appeal Cases, 182; Hantz v. Sealy, 6 Bin. 408; Reading Fire Ins. Co.'s Ap., 113 Pa. 204; Nathan's Case, 2 Brewster, 149. The declarations of deceased husband are admitted only as affecting his interest. As to the proof of marriage contract from cohabitation: Wh. Ev. § 84; Barnum v. Barnum, 42 Md. 295; Tholey's Ap., 93 Pa. 36; Rose v. Clark, 8 Paige, 574; 2 Phill. Ev. 115; Hunt's Ap., 86 Pa. 296; Grimm's Ap., 25 W. N. 181; Floyd v. Calvert, 53 Miss. 37; Adore et ux. v. Fossit, 1 Pears. 304. The declarations of Joseph W. Drinkhouse do not deserve the weight given them in the court below: Greenawalt v. McEnelley, 85 Pa. 352. Even the certificate alleged to have existed but never produced would not have been evidence of a ceremony of marriage: Wh. Ev. § 120, 657; Bishop M. & D. §§ 470–473; act of 1700, Dallas' Laws, 26; Stoever v. Whitman, 6 Bin. 416. Such certificate is no more than the declaration of the party: Camden v. Belgrade, 2 New Eng. R. (Me.) 65.

An auditor's finding of fact to be conclusive must be clear: Treasurer v. Shannon, 51 Pa. 221; Wesco's Ap., 52 Pa. 195; Field v. Oberteuffer, 2 Phila. 271; Church v. Church, 5 Phila. 358; Ford's Est., 8 Phila. 196; Milligan's Ap., 97 Pa. 525; Hindman's Ap., 85 Pa. 468; Phillip's Ap., 68 Pa. 130; Moyer's Ap., 77 Pa. 482. There are almost no findings of fact here.

*S. Morris Waln* and *John G. Johnson*, with them *Robert J. Williams*, for appellees.—Mrs. Drinkhouse was a competent witness: Greenawalt v. McEnelley, 85 Pa. 352. The admissions of J. W. Drinkhouse were competent: Hamilton v. Hamilton, 9 Cl. & Fin., Appeal Cases, 327; Vincent's Ap., 60 Pa. 228; Gaines v. New Orleans, 6 Wall. 642; Com. v. Cronin, 13 W. N. 76. The presumption is in favor of legitimacy: Senser v. Bower, 1 P. & W. 450; Vincent's Ap., 60 Pa. 238–246; Physick's Est., 2 Brewster, 179; Guardians of the Poor v. Nathan, 2 Brewster, 149; Taylor's Case, 9 Paige Ch. 611. While certificate of marriage would not be evidence, the husband's declarations about it would be: Hill v. Hill, 32 Pa. 511. As to proof of marriage by cohabitation: Kenyon v. Ashbridge, 35 Pa. 157; Richard v. Brehem, 73 Pa. 140, and cases cited by appellants; Freno v. Freno, 1 W. N. 165. Declarations against marriage are entitled to no weight: Taylor's Case, 9 Paige Ch. 611; Moore's Est., 48 Leg. Int. 4.

Proof of reputation and cohabitation are not only proofs of the contract but also evidence from which a marriage may be presumed. Adultery alone would not bar dower: Reel v. Elder, 62 Pa. 308.

An auditor's finding of facts will not be reversed if the evidence is sufficient to sustain them: Lewis's Ap., 127 Pa. 127; Sheehan's Est., 139 Pa. 168. The admission of incompetent evidence will not justify reversal unless the decision was influenced by it: Robert's Ap., 126 Pa. 102. Manifest error alone justifies reversal of finding of fact: Eggert's Est., 1 Northampton Co. R. 17; Morrison's Est., 5 Montg. Co. R. 155. The court's finding has the effect of a finding of a jury: Sheehan's Est., 139 Pa. 168.

OPINION BY MR. JUSTICE HEYDRICK, October 3, 1892.

The very able and earnest argument of the counsel for the appellants has failed to convince us that the learned court be-

low erred in finding that the appellees are the legitimate children of Joseph W. Drinkhouse, deceased. The auditing judge found the facts of a courtship of years followed by a marriage between the deceased and Maria Heaton, the mother of the appellees; the presence, at one time, of a marriage certificate, which was afterwards lost; the cohabitation of the parties; the birth of acknowledged issue; and a written declaration of the marriage in the decedent's handwriting, intended for his private use, and with no ulterior purpose whatever. And it does not appear that he was guided by erroneous principles in his consideration of the evidence from which he found these facts; nor is it denied that the evidence which he deemed material was such as could have been properly submitted to a jury if an issue had been demanded. We might, therefore, content ourselves with a simple affirmance of the decree: Sheehan's Estate, 139 Pa. 168; but the earnestness with which this appeal has been pressed seems to demand something more.

The mother of the appellees was a competent witness to prove her marriage with her deceased husband: Greenawalt v. McEnelley, 85 Pa. 352. Her testimony was direct and positive, and it is not denied that it was sufficient, if believed, to established the marriage. It is, however, contended that she was so far contradicted upon material points, and that her story, wherein it was not directly contradicted, was shown by the circumstances of her life and of that of Joseph W. Drinkhouse to be so improbable as to render her testimony as to the marriage incredible. I have examined the fifteen hundred pages of testimony, sent up with the record, and do not find any material contradiction of her testimony touching any matter occurring during the courtship of the parties or the first eight years of their married life, by any witness that appears to be entitled to greater credit than would be due to her under the most unfavorable view that can be taken of her character. Touching her manner of life and as to some of the places in which she lived, during her early girlhood and before she met Drinkhouse, she is flatly contradicted, and the atmosphere in which she grew up would seem to have been unfavorable to the cultivation of any of the virtues which should adorn woman or witness, if her family history thirty years ago has not been confounded with that of another family

of the same name. She was farther contradicted in respect to some matters occurring during the years subsequent to 1883, and her conduct, to put it as mildly as possible, was unwifely during these years. Upon a review of all of the evidence it would seem to be unsafe to find any controverted fact upon her unsupported testimony. An examination, however, of the voluminous evidence will show that she is corroborated as to all the material facts testified to by her.

The elder Mrs. Drinkhouse, who disowns Maria as a daughter-in-law, admits that Joseph brought her twice when a young girl to visit his father's family, and that she once came home with one of his sisters from some place of amusement and remained over night with her, sharing her room and bed. Another relative of Joseph testified that he often brought Maria to her house on their way to and from church, and spoke of her as his intended wife, and several members of the Heaton family and their kindred gave evidence as to the courtship, rumors that they were engaged to be married, and declarations of Drinkhouse to the same effect. Twenty-two witnesses not members of the Heaton family, were examined, to each one of whom Drinkhouse either introduced or spoke of Maria as his wife or was introduced by her as her husband after the date of the marriage as stated by her, May 1, 1875; and many of them testified to their cohabitation from that date until the latter part of 1883. To three witnesses Drinkhouse stated he was married in New Jersey, where Maria says the marriage ceremony was performed; and four witnesses swore that he told them a certain paper which he exhibited was the certificate of his marriage with the mother of the claimants. Seven children were born between May 1, 1875, and the death of Joseph W. Drinkhouse, and a majority of the forty-four witnesses examined upon the part of the appellees testified that he recognized these children as his own, and he has left conclusive evidence of such recognition in certain memorandum books in which their names are found in his own handwriting together with an account of expenses incurred in their behalf. Some of these children were enrolled in public and private schools as children of Joseph W. Drinkhouse from 1883 until 1888 inclusive, covering the period when it is alleged they were known by another name and as the children of another man, and the testimony of

teachers in these schools, and in Sabbath schools, and of music, puts it beyond question that they were reputed to be the children of Joseph W. Drinkhouse, and that their mother was known as Mrs. Drinkhouse during the time when appellants' witnesses say she was known as Mrs. McCombs or Mrs. Davis, and the children, by the same names. It is true that it does not appear that Drinkhouse authorized the enrollment of the children as his, but there is evidence of his recognition of them as his offspring and of their mother as his wife that puts it beyond doubt that he did so recognize them, and renders it highly probable that he placed them at school himself. In the fall of 1883 after he had taken up what is called " bachelor's quarters " on Spring Garden street one of the children became sick of scarlet fever. Dr. Pancoast was called in. He had been the physician of the Drinkhouse family for many years and knew Joseph, and could not be mistaken as to his identity. He met him several times at the house during the child's sickness and talked with him about her; made out his bill for services in his name and sent it through the mail to him and subsequently received payment by the hand of Mrs. Drinkhouse. The child died on the second of December and Mr. Bowen, the undertaker, was called in and found in the house with the mother a man who he supposed was her husband and its father, although he had had no previous acquaintance with either of the parties. It is not conceivable that the real father of the child would manifest parental solicitude during its sickness and at its death disappear and another turn up to claim the right and the burden of burial. But if a doubt could be conjured upon this subject, it is reasonably removed by Mr. Bowen. Six years later he buried another child for the same parties and less than three months thereafter he buried Joseph W. Drinkhouse himself, and of that there is no doubt whatever; and he swore that to the best of his knowledge and belief the man whom he met as the father of the child whom Dr. Pancoast attended was the same that he subsequently buried as Joseph W. Drinkhouse. This Joseph, then, was the man whom the undertaker met with the woman Maria, in the death chamber on the second day of December, 1883, and what then occurred is worth more than a great deal of gossip. Standing side by side in the presence of their dead one of these parties,

and it matters not which one, in answer to Mr. Bowen's questions, gave their names as Joseph W. Drinkhouse and Maria E. Drinkhouse, parents of the deceased child. If this was not in form a declaration by both that the parties were husband and wife, it ought to be so regarded in substance unless meretricious relations and permissive assumption by mistresses of their paramour's names are so common as to cast a doubt upon the ordinary indicia of the matrimonial relation.

And finally there is an entry in the handwriting of the decedent in one of his private memorandum books in these words : "Married May 2, 1875." It has not been suggested to what else this could refer than his marriage with Maria Heaton. Doubtless it is of no higher character as evidence than an oral admission, but such admissions are in the nature of direct proof : Greenawalt v. McEnelley, supra.

From all this evidence, evidence of courtship, of cohabitation, of admissions of the marriage, oral and written, of the birth of acknowledged issue, and of open and notorious parental care of that issue, a jury would have been justified in finding a contract of marriage. Satisfactory evidence that the cohabitation of the parties had at any time been meretricious would, for obvious reasons, eliminate subsequent cohabitation, as a fact from which marriage might be inferred. And if it were shown that admissions of marriage had been made when in fact no marriage had been contracted, that circumstance ought to greatly weaken the effect of subsequent admissions as an item of proof ; but it would be a harsh rule that would exclude them altogether when the circumstances of the lives of the parties had entirely changed and the legitimacy of their acknowledged offspring was in issue. In the present case it is reasonably certain that there was an admission of marriage upon one occasion something more than a year before the date of the ceremony testified to by Mrs. Drinkhouse. But the evidence of illicit intercourse and cohabitation prior to that date is far from being satisfactory. It is found in the fact that a child was born within a little more than seven months after the first of May, 1875 ; and in the testimony of Mrs. Drinkhouse that she lived with Joseph at the house of her brother-in-law Crawford in Hazzard street ; in that of a Mrs. Crawford not related to her, that the Crawfords moved from Hazzard street *about*

March, 1875, and in that of Matilda Culbertson who was even more indefinite as to dates. The birth of the child between seven and eight months after the date of the alleged marriage, is a circumstance which ordinarily would be entitled to very little, if any, consideration. It is, however, one that could hardly have escaped the attention of the mother, and it does not seem probable that, if fabricating the story of the marriage, she would have fixed a date that would suggest a doubt about the purity of her ante-nuptial relations with Drinkhouse. As to the testimony of Mrs. Crawford it is enough to say that she did not appear to have any means of fixing the date of the removal from Hazzard street, and it would have been remarkable, if, after fifteen years, she could have stated it with anything approaching accuracy, or if there had not been quite as much confusion in respect to dates and the locality of events as was exhibited in this case. It would be unsafe to find from such testimony, that the cohabitation commenced before the first of May, 1875. There being, then, no sufficient evidence of meretricious cohabitation prior to May, 1875, there is no reason why the subsequent cohabitation for a period of eight years should not have the ordinary effect as an item of proof, and in the absence of any direct evidence that that cohabitation was illicit, Drinkhouse's often repeated admissions of the marriage, some of them under solemn circumstances, and others giving the time and place of the ceremony, are entitled to some consideration notwithstanding the fact that the first admission was untrue at the time it was made, and that at another time he declared to his brother that he was not married. The case is not like Bicking's Appeal, 2 Brewst. 202, or Yardley's Estate, 75 Pa. 207, in neither of which was such cohabitation shown as was shown here. Nor does it resemble Reading Fire Ins. Co.'s Appeal, 113 Pa. 204. In each of these cases the evidence was overwhelming that the relations of the parties were meretricious from beginning to end.

There is nothing improbable in the story told by the mother of the appellees. Upon the theory of the appellants it is quite certain that she was the peer of Joseph W. Drinkhouse. If she was what we are asked to believe her to have been, the man who would introduce her to his sister and permit her to share that sister's bed for a single night might be expected to

seek a wife in the slums and ought to find one nowhere else. His partial separation from her after 1883 is sufficiently accounted for upon other grounds than dissatisfaction with her morals, if that could have the slightest effect upon the question whether there had been a marriage contract before that time. And the fact that the marriage had never been heard of by any of his family is well accounted for by their confessions, express in some instances, and implied in others, that they did not know where he lived from 1875 until 1883 or 1884, although they all resided in the same city and one brother claimed to have been intimate with him and frequently visited him at his store. And it is significant that this brother frequently visited him at his bachelor quarters before 1875, and at his room in 1884, and is silent as to his domicile during the intervening period.

The decree of the orphans' court is affirmed.