Estate of Louis B. Hines.    Appeal of Elizabeth R. Hines.

*Marriage—Evidence of reputation and contract.*

The words "I will take you for my wife," assented to by the woman, will constitute a valid contract of marriage when immediately followed by the living together of the parties from that time on until death, more especially when reinforced by sufficient evidence of marriage by reputation.

*Marriage—Reputation and cohabitation as evidence—Present intent of an executed contract—Review—Appeals—Findings of court below.*

Reputation and cohabitation are not marriage but they are facts from which marriage is presumed, and the finding of the orphans' court that a legal marriage existed in a case admittedly doubtful will not be disturbed when based upon the facts of reputation and cohabitation coupled with the repeated declarations of the parties and their acts which were equivalent thereto, which corroborated the testimony of the alleged wife as to the contract as showing the sense in which the parties used the words of such alleged contract.

The crucial fact in such cases is, did the cohabitation begin in the agreement testified, to and did the parties intend a present marriage and not a mere executory contract to marry.

Argued Dec. 12, 1898.   Appeal, No. 18, Oct. T., 1898, by Elizabeth R. Hines, from decree of O. C. Phila. Co., Jan. T., 1897, No. 389, dismissing exceptions of Elizabeth R. Hines, thereto.    Before RICE, P. J., ORLADY, SMITH, W. W. PORTER and W. D. PORTER, JJ.    Affirmed.    Opinion by RICE, P. J.

Petition for widow's exemption.    Before the court in banc.

It appears from the record that the petitioner calling herself Laura B. Hines, the wife of Louis B. Hines, the decedent, who died intestate, filed a petition for widow's exemption.    To the petition exceptions were filed on behalf of Elizabeth R. Hines, mother of decedent, as his heir and next of kin, denying that the petitioner was the lawful wife of decedent.    The petition set out that the personal property left by decedent amounted to the sum of $7,084 and that while the contest upon the record involves only the right to the widow's exemption, the decision determines the right to other property of decedent.

The court below, in an opinion by ASHMAN, J., reported in 7 Dist. Rep. 89, sustained the petition, finding that the words "I will take you for my wife" were uttered by the decedent and

assented to by the woman and that such words constitute a contract of marriage when immediately followed by the living together of the parties from that time until death, and that the contract was reinforced by sufficient evidence of marriage by reputation.

Exceptions were filed on behalf of the mother of decedent to the finding of the court that the said Laura Schaffer calling herself Laura Hines was the widow of the late Louis D. Hines as alleged in said petition.

The prayer of the petition was granted and an order made on the administrator to set apart and pay to Laura Hines the widow of said decedent the sum of $300 out of the personal estate of decedent. Elizabeth R. Hines appealed.

*Error assigned* among others was to the decree of the court granting the prayer of the petition and ordering the payment of the widow's exemption.

*Horace M. Rumsey* and *Alex. Simpson, Jr.*, for appellant.— The findings of fact by the court below are not conclusive: Mirkil v. Morgan, 134 Pa. 144; Beale v. Kline, 186 Pa. 381.

Other argument of the appellant's counsel was directed to show upon the evidence the relation of appellee and decedent as illicit prior to the alleged contract of marriage; to the character of the alleged widow and to the evidence as contradicting the alleged marriage contract and to the question of the credibility of the petitioner, contending that the appellee is not worthy of belief.

*Allen H. Gangewer*, with him *James B. McCarron*, for appellee.—The facts in this case are similar to and ruled by Richard v. Brehm, 73 Pa. 140, and Comly's Estate, 185 Pa. 208. In Green's Est., 19 Phila. 55, cited by appellant, the principles of law there laid down are favorable to appellee's position.

OPINION BY RICE, P. J., April 17, 1899:

This is an appeal from a decree allowing the petition of Laura Hines for the "widow's exemption." The question raised by the exceptions, all of which were overruled, is, whether the petitioner and the decedent were married. The learned judge

of the court below has concisely stated the circumstances under which these parties came together, and their ostensible relations thereafter up to the time of the death of Louis B. Hines, as follows. He says: "The petitioner, at the age of sixteen, made the acquaintance of the decedent while working along with him in his father's factory. He visited her at the houses where she successively boarded, and during a period of about a year took her at intervals to places of amusement. At the end of that time, in April, 1892, he rented a house and opened a cigar store, and two weeks afterwards his relations with the petitioner as her ostensible husband began, and continued uninterruptedly to the day of his death, in December, 1896. The petitioner was the only witness who swore to a contract of marriage. She said that after repeated requests from him to marry, which she had declined, she consented to keep house for him, upon his statement that his mother would reside with them. Upon going to the house, he asked her if she would stay and become his wife, and she refused because the mother was not there." He then said (we now quote the testimony of the witness verbatim) : "I will take you for my wife ; and asked me if I was satisfied, and I said, 'yes,' and he said he would have a ceremony performed, but he did not have any money at the time; he was in bad circumstances at that time, and said he would have money later on. Q. Did he give any explanation that that would be all right? He asked me if it would suit me for the present time, and I said, 'yes.' Q. What did he say in reference to it? A. He said no minister could make us any happier than what we would be by what he said to me. Q. Did you finally consent? A. Yes, sir." She continued to live with him from that time. The opinion, which we take as the findings of the court below upon the questions of fact, proceeds : "In the course of a year a child was born, and was reared by the decedent as his own. He introduced the petitioner as his wife to friends and neighbors, and the neighborhood recognized the relation. His mother brought presents to the child, and when, shortly before his death, he removed to another part of the city, she came to live with him. When very ill and within a few days of his end, he spoke to his mother of his marriage to the petitioner. At his funeral the petitioner rode in the leading carriage with his brother, and when a subsequent visit was made

to the cemetery, she was accompanied by his mother. At the mother's instance, she formally renounced her right to administer the decedent's estate." From these facts the court found that there was a marriage. As the assignments of error are to this general conclusion and not to the specific findings of fact upon which it was based, our discussion will be directed to the points made on the oral argument and in the printed brief of counsel.

1. It is argued that if the words of this contract were sufficient in law, because followed by cohabitation, yet illicit intercourse having preceded, they did not establish a valid marriage. We need not review the cases upon this subject, because taking any statement of the rule that can be deduced from them, there is no sufficient evidence to warrant its application here. There is evidence, but not uncontradicted, that the decedent took, and the petitioner permitted him to take, indecent liberties with her. This is as far as the competent evidence goes. It should be observed also that at this time the parties lived entirely apart and that the acts testified to were in the presence of many other persons. The evidence, if true, does not raise a prima facie presumption even, much less establish the fact, that the cohabitation after the alleged contract of marriage was the mere continuation of an illicit relation that had existed before. The latter fact must first be proved by clear and satisfactory testimony before the principle of Hunt's Appeal and kindred cases can have any application: Drinkhouse's Estate, 151 Pa. 294.

2. The fact, even if it were conclusively shown, that during their cohabitation at Fourth and Catherine streets, the parties kept an unlicensed place for the sale of liquor where men were permitted to resort for card playing, or even gambling, would throw little if any light upon the question of marriage. The fact that they kept an assignation house or that the petitioner had immoral relations with others, either with or without the knowledge of the decedent, might have some significance. It is urged that "the alleged marriage contract is founded upon the story of a prostitute, without a line of direct substantial proof to support it, and in the face of continued prostitution during the whole period of the marriage." We suppose that the testimony as to the reputation of the house and of the petitioner was introduced with a view to sustain this allegation.

We shall not attempt to recite it, nor comment on the sources from which it came. We have examined it all, and our conclusion is, that the allegations that the house was an assignation house and that the petitioner was a prostitute before the alleged marriage, and lived the life of a prostitute afterwards are not sustained. We do not believe that any jury taking a fair view of all the legitimate evidence pro and con, and having proper regard for the presumption in favor of innocence, would find that they were established. It may be said, that, although the evidence fails to establish these facts fully, it does show a course of conduct which is quite as consistent with the exceptant's allegation that the relation between these parties was a meretricious one, as with the petitioner's allegation that it was the lawful and honorable one of marriage. We have considered it in that view and have given it proper weight, but cannot agree, that, take it by itself or in connection with the other testimony introduced by the exceptant, it is sufficient to overthrow the petitioner's positive testimony as to the marriage contract and the presumptions arising from cohabitation and reputation, and the repeated admissions and declarations of the parties.

3. Four of the witnesses who testified as to the character of the house and of the petitioner were also called to testify as to the repute of marriage. One of them testified that some thought they were married and others not; that the general feeling through the neighborhood was that they were not married; and that this impression was created to some extent by the conflicting statements the decedent made as to the place where the marriage had taken place. (It would seem, therefore, that, at all events, the decedent claimed that there was a marriage.) This witness admitted, moreover, that the petitioner was addressed by the majority of people, both in and out of the decedent's presence, as Mrs. Hines; that the witness so addressed her; that the child called the decedent "pop;" and that the latter spoke to and of the child as his own. Another witness testified that many of the neighbors doubted whether they were married; "others did not speak their mind on it, as it was not material;" that many of the neighbors thought she was simply his housekeeper. This witness gave the singular reason amongst others for his belief that she was not his wife that he had "seen many men treat their housekeepers better than he treated her."

After testifying " candidly," as he asserted, that he had never heard her spoken of as Mrs. Hines the witness admitted that he called her by that name, and, finally that " she was generally spoken to, or of, as Mrs. Hines ; " also that the child spoke to the decedent as his father. No comment upon the testimony of this witness is called for. The third witness went no further into the subject of the repute of marriage than to say, that some of the people there called her Mrs. Hines, and others Laura. The next witness summed up the matter thus : " There was a variety of opinion; the majority said she was not, or she would not have behaved in the manner she did if she was his wife. There seems to be a variety of opinion among the neighbors." The witness admits, however, that he sometimes called her Mrs. Hines. The foregoing is, we believe, a fair summary of the testimony introduced by the exceptant pertaining strictly to the speech of the people in the neighborhood as to the marriage of the parties. Before speaking of the testimony introduced by the petitioner upon the same subject we will briefly refer to the alleged declarations of the decedent.

4. His brother, his aunt and four or five other witnesses testify to declarations more or less positive made by the decedent at different times to the effect that he was not married. These declarations did not deter the aunt and the mother from visiting the decedent's home, and receiving visits from the petitioner, nor the brother from permitting the petitioner to ride with him as chief mourner at the funeral, nor the mother from taking up her home with them when they moved to Euclid avenue ; and, notwithstanding them, it was thought advisable by those interested to obtain from the petitioner a formal renunciation of her right to administer. This was drawn for her to sign and was signed, " Laura Hines." To say the least, the conduct of these relatives did not show a very positive reliance on the decedent's alleged assertions to them that he was not married. Indeed, the mother admits that in November, 1896, her son told her he had been married to the petitioner in New Jersey. None of these declarations of Louis B. Hines that he was not married were made in the presence of the petitioner, and while we do not say that the evidence was wholly inadmissible—see Greenawalt v. McEnelley, 85 Pa. 352—yet, as the learned judge of the court below well says, a man cannot rid himself of a marriage

otherwise proven by asserting that it never took place. If he can, then the oftener he asserts it, after he has tired of the duties and obligations he has assumed, the stronger the case made out for himself.

5. A half dozen witnesses living in the neighborhood testified either that they had the reputation of being husband and wife among their neighbors or that they never knew or heard anything else but that they were married. This negative testimony, coming from near neighbors and acquaintances, is entitled to about as much weight in proving the speech of the people in such a matter as positive testimony that the neighbors said they were man and wife. If two young people living as these did are not cohabiting as man and wife, and holding themselves out to the world as living in that relation, the neighbors would be very likely to speak of it. The same witnesses, as well as seven or eight more, testify, that the decedent uniformly spoke of and addressed the petitioner as his wife, and the child as his child. The petitioner did the work of the house, helped him in his business, attended the store, and during some of the time earned money by sewing to keep the house. When her child was about to be born, the decedent summoned the physician to deliver " his wife ; " the bill was made out in that way ; and the fact that the child was his son was recognized in the certificate of birth and in the application for the policy of insurance which, later, the decedent took out on the child's life. When the decedent sold out to the Shapiro the former said that his wife must sign, and accordingly the petitioner witnessed the paper as " Mrs. Hines." We need not attempt further to marshal the evidence upon the subject of repute. Probably we have gone into it further than was needed already. It cannot be said, that all the facts upon which the decree was based are proven beyond the possibility of a doubt; we are, however, clearly of the opinion that the preponderance of the evidence, whether considered with reference to the number or to the credibility of the witnesses favors the conclusion, that during all the period of their cohabitation these people had the general repute among their neighbors and acquaintances, of being husband and wife, and that they recognized and treated each other as persons living in that relation.

The counsel for the appellant admit that it is useless to at

tack the competency of the petitioner to testify: Greenawalt v. McEnelly, 85 Pa. 352; Drinkhouse's Appeal, 151 Pa. 294; Luce's Appeal, 3 Pa. Superior Ct. 289; Comly's Estate, 185 Pa. 208. They do assert, however, with much vigor, that her testimony as to the alleged contract is unworthy of belief; and in support of their contention refer to the fact that the reason alleged to have been given her by the decedent for not having a ceremony performed was not true. But that does not contradict her. The evidence, if believed, simply tends to show that he did not tell her the truth. Allusion is made also to the absence of proof that he gave her a ring; to the contradiction of her testimony as to the precise date of the contract, as to her age, as to her engagement with Weber—he swearing that it was broken off by him, and she that it was broken off by her—and other minor matters. As we have said, the case is not absolutely one-sided. The testimony must be weighed. But we are unable to conclude that these discrepancies and contradictions are in such vital matters as to outweigh the facts corroborating her, and to compel the rejection of her testimony in toto, even if we were convinced that she was in each of these instances incorrect. The dispute as to what she said at the death bed of the decedent is more serious, as the learned judge of the court below says, but we are not convinced that he did not reach the correct conclusion upon that question of fact and we approve it, as well as what he says upon the subject of her relations with Weber and the marriage certificate, without further comment.

Did the cohabitation begin in the agreement testified to, and did the parties intend a present marriage and not a mere executory contract to marry? These are the great questions in the case. Reputation and cohabitation are not marriage, as has frequently been said; but they are facts from which marriage is presumed. In the present case, these facts, coupled with the repeated declarations of the parties and their acts which were equivalent thereto, have the additional effect of corroborating the testimony of the petitioner as to the contract and of showing the sense in which they used the words. The testimony convinced the court below that they intended a present marriage, and in this conclusion we concur. Interpreting the words of the contract in the light of the intention and acts of the par-

ties as found by the court upon ample testimony the case is fairly within the principle of Richard v. Brehm, 73 Pa. 140, and Comly's Estate, 185 Pa. 208.

The decree is affirmed and the appeal dismissed at the cost of the appellant.