## Wydra, Appellant, *v.* Philadelphia & Reading Coal & Iron Company.

530

Submitted October 26, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Roger J. Dever,* for appellant.

*E. Mac Troutman* and *Penrose Hertzler,* for appellee.

OPINION BY KELLER, P. J., November 17, 1943:

This is a workman's compensation case. The appeal involves the validity of the claimant's marriage to the deceased employee, Edward Joseph Wydra, also known as Adam Wydra.

It is undisputed that the relation between them was meretricious at its inception; for he had a legal wife (Stella Wydra) living at the time they had sexual intercourse, resulting in the birth of a son, Edward Joseph Wydra, on March 22, 1938. About two weeks thereafter they began housekeeping on Chestnut Street, Kulpmont, where they lived together, with their child, ostensibly as husband and wife. This continued until shortly after the death of his mother in May, 1939, when the three of them moved into the home of his father, Joseph Wydra, 942 Spruce Street, Kulpmont, with whom they all continued to live until the employee's death on January 20, 1941, as the result of an accident in the course of his employment with the defendant. During all that time the claimant and the employee cohabited together as husband and wife and were so known and reputed in the neighborhood. Of course that did not make them husband and wife, for as long as Stella Wydra was living and undivorced, Edward Joseph Wydra (or Adam Wydra) was legally incompetent to marry the claimant.

But on April 6, 1940 Stella Wydra procured a divorce in Northumberland County from Adam Wydra (also known as Edward Joseph Wydra) on the ground of desertion; and thereafter he and the claimant were legally competent to marry each other. It is the circumstances following this divorce that rule this case.

It was proved by a number of witnesses that shortly after the final decree of divorce was entered, a 'wedding party' was held in the father's home, to which they were invited as guests and were present when the parties, the claimant and the employee, Wydra, publicly took each other as husband and wife respectively and Wydra placed a ring on her finger in token of their marriage. The witnesses were foreigners not familiar with the niceties of grammar or the distinction of tenses in English, and there was some difference of recollection as to the language used.

The claimant testified:

"Q. After this divorce was granted then did you marry this man? A. I just make a party, dinner wedding in my father-in-law's house. Q. What happened there, what did he say to you and what did you say to him? A. There were people there and everything on the table and he said 'Mary, are you going to be wife and husband' and gave me a ring and I took that ring and I said 'Joseph, I am going to be your wife.' Q. And did you go to live after that as husband and wife? A. Yes. Q. Where? A. In the house."

Antoinette Rakus, a niece of claimant, testified:

"Q. Were you present at the dinner of these parties, this woman testified to? A. Yes. Q. Where was that held? A. On Spruce Street, Kulpmont. Q. What was the purpose of that dinner? A. To celebrate a wedding. Q. Who were the parties to that wedding? A. Mary Wydra and Edward Wydra. Q. The fellow who was killed? A. Yes. Q. What did you hear and see at that wedding? A. At the table he put a ring on her finger and said 'Mary, I want you to be my wife' and Mary said to him 'Edward, I want you to be my husband.' Q. And then he put the ring on her finger? A. Yes. Q. Did you enjoy the wedding feast? A. Yes; we congratulated them and wished them a lot of happiness."

Bernard Robacheski, a brother of claimant, testified:

"Q. Were you present at this supposed wedding cere- mony? A. Yes. Q. Where did it take place? A. On Spruce Street, Kulpmont. Q. What did take place? A. He gave me an invitation to the wedding and I came over and he said 'Mary, I take you for my wife' and she said 'I take you for my husband' and he put a ring on her finger. Q. And they lived together from then on? A. Yes."

Stella Giacowski, claimant's sister, testified:

"Q. Did you attend this wedding? A. Yes. Q. Where was that held? A. On Spruce Street, Kulpmont,

Q. What time of day was it held? A. I don't know, some day in May. Q. Evening? A. Evening. Q. Why was it held there, do you know; why did they have the wedding like that? A. Wedding. Q. Have a good time at the wedding? A. And how; lots of drink, lots of beer, everything. Q. What did these people say to each other? A. Joe Wydra said 'You be my wife, I be'— I can't say. Q. Husband? A. That is right."

Joseph Wydra, the father of the deceased employee, testified that shortly after the divorce was granted, his son and the claimant married each other, at a wedding party held in his home, at which his son put a ring on her finger and said 'You be my wife' and she said 'You be my husband'; but as he later retracted this testimony, when called as a witness by the defendant, the board did not give it much weight.

The circumstances attending the gathering—the *wedding* dinner or supper—the use of the ring—in connection with the language used by the participants—some of which was clearly in the present tense,[1] and all of which contemplated an immediate taking in marriage— warranted a finding by the board of a present intention on the part of both man and woman, then and there, to enter into the relation of husband and wife. That was the object of the gathering. It was not a betrothal dinner. It was a wedding dinner. The fact that the witnesses did not exactly agree in their recollection as to the words used by Wydra and the claimant lends support to their truthfulness. If the words used by all had been precisely the same, it would have suggested a rehearsed story.

The circumstances of this case clearly distinguish it from *Wolford v. Whiterock Quarries,* 144 Pa. Superior Ct. 577, 20, A. 2d 887, relied on by the court below, in that (1) the words there used were casually spoken,

---

[1] See the testimony of *Bernard Robacheski* and *Stella Giacowski,* supra.

immediately following the receipt of news that Wolford had been divorced by his wife, and not at a gathering called to be present at a wedding, and (2) the claimant admitted that thereafter they had fixed a day on which they would be married, and that Wolford was killed before that day arrived.

We held that the testimony in *Sharpe v. Federal Cleaning Co.*, 144 Pa. Superior Ct. 231, 233, 19 A. 2d 509, was sufficient to support a finding that a common law marriage had taken place, but held it invalid because the man was already married when it took place. The testimony was no stronger, if as strong, in *Caddy v. Johnstown Firemen's Relief Assn.*, 129 Pa. Superior Ct. 493, 496-498, 196 A. 590; *Estate of William A. Goldman*, 109 Pa. Superior Ct. 388, 390, 391, 167 A. 244; *Hines's Est.*, 10 Pa. Superior Ct. 124, 126; *Brown v. Nolen*, 298 Pa. 384, 387, 148 A. 498; *McGrath's Est.*, 319 Pa. 309, 179 A. 599; in all of which the marriage was sustained.

It must be remembered that the workmen's compensation board is the fact-finding body; that neither the court of common pleas nor this court can disturb its findings of fact if there is sufficient competent evidence to support them, and they do not contravene some established principle of law.

The evidence, if believed, was sufficient to support a finding that Edward Joseph Wydra and the claimant, in the presence of witnesses invited to be guests at their "wedding", married each other, using words uttered for the purpose and with the intent of *then and there*—that is 'in praesenti'—assuming the relation of husband and wife, and that following the same they lived together as man and wife continuously to the date of his death. This would be sufficient to establish a legal marriage. The board, in effect, so found, and its finding being supported by sufficient competent evidence, and not being in contravention of law, cannot be disturbed by the lower court or this court, whether

it or we would have made the same finding, if we had been the triers of fact.

If, as the board found, a valid legal marriage took place between the claimant and the decedent, their child born before marriage was thereby legitimated (Act of May 14, 1857, P. L. 507, 48 PS §167) and he is to be regarded as a legitimate child of the deceased employee and not a child to whom such employee stood in loco parentis.

The assignments of error are sustained. The judgment is reversed, and the record is remitted to the court below with directions that judgment be entered on the award of the referee, as affirmed by the board.