Kiska *v.* C. H. Ziegenfuss Co., Inc., et al.,
Appellants.

Argued December 6, 1943. Before BALDRIGE, STADT-
FELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.
(KELLER, P. J., absent).

*Paul H. Ferguson,* with him *G. Mason Owlett,* for ap-
pellants.

*D. M. Garrahan,* for appellee.

OPINION BY RHODES, J., January 27, 1944:

This is a workman's compensation case, and involves an alleged common law marriage of claimant and the deceased employee, Paul Kiska. The claimant filed a petition with the Workmen's Compensation Board asserting that she was the common law wife of Paul Kiska who died on April 10, 1940, as the result of an accident which occurred in the course of his employment with defendant employer, and that she was entitled to compensation as his dependent widow. An answer was filed to the petition in which it was denied that claimant was the common law wife of deceased. The referee made an award in her favor finding that she was the common law wife of deceased. The compensation board on appeal reversed the referee. On appeal the court of common pleas reversed the board. Defendant employer and its insurance carrier have appealed from the judgment entered.

The board affirmed the referee's basic findings of fact but set aside the referee's fifteenth and seventeenth findings of fact and third conclusion of law,[1] substituting therefor the following:

"15. At the time of the decedent's death, the claimant was living with, and supported by, the decedent,

---

[1] The referee's fifteenth and seventeenth findings of fact and third conclusion of law are as follows:

"15. At the time of decedent's death claimant was living with the decedent, and was entirely dependent upon him for her support."

"17. From the evidence in this case we find as a fact that on December 11, 1918, the claimant and the decedent entered into a common law marriage."

"3. At the time of decedent's death the claimant was the common law wife of the decedent. The claimant was living with the decedent, and was entirely dependent upon him for her support, and therefore, is entiled to compensation."

but their status was not that of husband and wife, either by virtue of civil or religious ceremony or of a common-law relationship." [2]

"17. From the evidence in the case, the Board finds as a fact that no agreement or contract constituting a marriage by common law was entered into by and between the claimant and the decedent on December 11, 1918."

"3. The claimant at the time of decedent's death and prior thereto, although living with the decedent, and dependent upon him for support, their relationship was illicit and meretricious and not a valid common-law marriage, wherefore, she is not entitled to compensation."

The court of common pleas overruled these findings and conclusion of the board and adopted as its findings and conclusions the findings of fact and conclusions of law of the referee. Cf. *Hudek v. United Engineering & Foundry Co. et al.*, 152 Pa. Superior Ct. 493, 33 A. 2d 41. We have frequently said that the court of common pleas cannot disturb the board's findings of fact if there is sufficient competent and substantial evidence to support them and they do not contravene some established principle of law. *Wydra v. Philadelphia & Reading Coal & Iron Co.*, 153 Pa. Superior Ct. 529, 34 A. 2d 326.

Some of the underlying facts as determined by the referee and the board are merely summations of the undisputed testimony; no evidence was offered by defendant. They show, inter alia, what purports to have been a common law marriage between the parties on December 11, 1918, and state in brief the evidence as to cohabitation and reputation.

---

[2] "Whether one person has been legally married to another is not a pure question of fact. It is a mixed question of fact and law": *Baker v. Mitchell et al.*, 143 Pa. Superior Ct. 50, at page 55, 17 A. 2d 738, at page 741.

The eighth finding of fact reads as follows:

"8. Paul Kiska, Jr., was born on February 11, 1918. On December 11, 1918, in the kitchen of claimant's home, in the presence of her children the claimant and the decedent had the following conversation: The decedent said 'I take you same wife and I want to live with you.' The claimant then said 'Alright you want to take me that you stay with me, I take you same my husband.' "

The ninth and fourteenth findings of fact, however, read as follows:

"9. On several subsequent occasions, the claimant asked the decedent to have a church marriage. This the decedent promised to have done, the last occasion occurring three days before he died."

"14. The decedent on one occasion told Charles Krisko, the son of claimant by her first marriage, that the decedent and the claimant would some day be married by a priest. On one occasion decedent told his sister, Elizabeth Krschnovy, 'some day you will come to my wedding.' "

The claimant herself testified: "Q. Did you ever ask Paul to go to a priest with you and go through a formal marriage ceremony? A. Yes, I told him couple of times, all the time to go. Q. Did he say he wouldn't do it? A. Say, just you wait Mom I do it. After he said all the time, just like that. Q. Promised you he would do it? A. Oh yes. Q. Just put it off? A. That one day happened; for that day it happen, he say, 'just you wait Mom, I straighten up everything.' He started for work that time started for work. I guess four or five weeks. ...... Q. Five weeks before he had promised to go to a priest and be married? A. Before that three days, when it happened for this trouble. All the time told me that. Q. Three days before he died he told you he would take you to a priest? A. Yes. Q. And you were to be married by the priest? A. Yes, and he said

that time take care of everything. That day he don't work, rainy day."

A sister of deceased testified: "Q. Did Paul ever say anything to you about Eva being his wife? A. Yes, he told me a couple of times. Q. What did he say? A. He said, 'some day you will be out to my wedding. I won't tell when; just some day I come for you.' That is what he told me. ...... Q. You say Paul told you sometime you were going to attend his wedding? A. Yes. Q. Was that after his son Paul was born? A. Yes. Q. You knew he wasn't married to Eva? A. Yes, he told me always, lots of times. Come once, he said, 'you will be out on my wedding. Don't you be worried how it come off.' Q. But he never did get married? A. Because they were happy before his trouble, he got killed." The testimony of a witness who had known claimant and deceased since 1912 was as follows: "Q. Were they generally known to be husband and wife? A. Not exactly, but when they was talking together I believe that was so to them. ...... Q. Did you ever hear talk about this boy being born and about Paul and Eva getting married? A. Yes, people say so. They tell me get a license and going to be married."

The board was of the opinion that both parties considered a religious ceremony desirable and necessary for the establishment of their marital status, and made its ultimate findings accordingly.

There is no doubt that the parties were capable of entering into a common law relationship, and that there was testimony which tended to establish this relationship by cohabitation and reputation. But we think the ultimate finding of the board to the effect that claimant was not the common law wife of deceased was warranted by the record.

It is not necessary for us to decide whether the referee's finding that claimant and deceased entered into a common law marriage on December 11, 1918, if it had

been affirmed by the board, would be sustained.

Although a court may feel that the weight of the evidence as a whole is against the finding of fact made by the board, it may not disturb that finding if it is supported by sufficient competent and substantial evidence, and there can be no judicial interference with such findings, whether they are based on proved facts or inferences therefrom. *Paulin v. Williams & Co., Inc., et al.,* 122 Pa. Superior Ct. 462, 466, 186 A. 415, affirmed 327 Pa. 579, 195 A. 40.

The board's seventeenth finding is therefore conclusive, and its order of disallowance must be sustained.

Deceased employee died on April 10, 1940. Claimant's husband died on January 16, 1917. In April, 1917, deceased came to live with claimant as a boarder, at No. 1824 Fairview Street, Allentown, Pa., and they lived at that address until deceased's death. A son was born on February 11, 1918, and the alleged common law marriage took place on December 11, 1918. It is undisputed that claimant's relations with deceased were in the beginning meretricious. A relation shown to have been illicit at its commencement does not raise any presumption of marriage, and such relationship is presumed to continue until a subsequent actual legal marriage is proved. *Wolford v. Whiterock Quarries, Inc., et al.,* 144 Pa. Superior Ct. 577, 580, 20 A. 2d 887.

We observe no inconsistency between the findings of the board refusing compensation, and they can be sustained without a capricious disregard of the competent evidence. *Walsh v. Penn Anthracite Mining Co.,* 147 Pa. Superior Ct. 328, 333, 24 A. 2d 51. The finding as to what occurred on December 11, 1918, is not inconsistent with the finding of the board that under all the evidence there was no agreement or contract constituting a marriage by common law entered into or intended between the claimant and deceased. The only witness present at the time of the conversation between claim-

ant and deceased, who testified in these proceedings, was a son of claimant by her first marriage. At the time of the incident he was thirteen or fourteen years of age. He testified: "Q. Had your mother and Paul Kiska agreed to get married at that time? A. He asked my mother. Q. Asked your mother to marry him? A. Yes, he asked my mother. ...... Q. All you remember is that he said, that he asked your mother to be his wife, and she said she would take him for her husband; is that all you remember of what they said? A. Yes. Well they talked of other things, but I wasn't listening in on it. Q. Talked about going to a priest to get married at that time? A. Not at that time. Q. Well did they fix any day they would go to a priest? A. They were going to get married. Q. Was that said at this time in the kitchen? A. It was said. Q. That they would go to a priest? A. That they would go later. Q. Did they fix any day for going to the priest? A. No." That the words relied upon as constituting the marriage agreement amounted to no more than a mere promise of marriage in the future is, we think, a permissive and reasonable inference when considered with the other evidence.

Judgment is reversed, and here entered for defendant.