Commonwealth ex rel. McDermott, Appellant, *v.* McDermott.

Submitted June 16, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*William T. Smith,* for appellant.

*John F. Pyfer, Jr., William W. Boyd,* and *Xakellis, Perezous & Mongiovi,* for appellee.

OPINION BY HOFFMAN, J., October 9, 1975:

Appellant contends that the court below erred in sustaining a demurrer to the evidence of the existence of a common law marriage, which would entitle her to support.

Maria J. McDermott, appellant, and John R. McDermott, appellee, were married in Mgladbach, Germany, on October 26, 1948. Two sons were born of the marriage before the parties were divorced in Germany on October 11, 1966. Appellant and her two sons moved to Harrisburg shortly after the divorce. She and her husband continued to correspond. She testified that her husband had written: "he don't care if people know we're divorced or not divorced; he's still my husband, and you are still my wife." In June of 1967, Mr. McDermott arrived at appellant's residence and announced his arrival with the words: "Here I am. You want to be my wife again?" Appellant responded, "Yes."[1] They cohabited for nearly

---

1. Appellant testified on cross-examination that Mr. McDermott said: "Here I am, your husband. Will you be my wife?" She also testified that she was not sure exactly what words were spoken, but that the words were to this effect. Steven Albert McDermott testified that he was present when his father arrived at his mother's home and that there was a big "love scene." He could not testify as to the precise words spoken. As it will be seen, this relatively minor discrepancy is not important.

five years before separating again. During that time, each introduced the other to friends and neighbors on several specified occasions as "my wife" or "my husband." They enjoyed a reputation in the community as husband and wife which was corroborated by her 23-year-old son and by her neighbor. They filed joint tax returns with the customary sworn statements as to the truth of the contents of the return.

Additionally, appellant testified that she was named as beneficiary on an army insurance policy and on a pension plan with Mr. McDermott's employer. After the parties separated in September, 1972, Mr. McDermott continued to pay support under an informal support agreement, which was discontinued two years later when Mr. McDermott was fired from his job.

On May 10, 1974, this action was commenced for support. After appellant had presented her evidence of a common law marriage, the court sustained a demurrer to the evidence and testimony was confined to Mr. McDermott's liability for support of his minor child. The court ordered him to pay $50.00 per week in support for the child but allowed nothing for appellant. This appeal followed.

It is settled that marriage is a civil contract, and does not require any particular form of solemnization before an officer of a church or of the state. *Bisbing's Estate*, 266 Pa. 529, 109 A. 670 (1920); *Murdock's Estate*, 92 Pa. Superior Ct. 275 (1928). The "black letter" rule is often stated that a nonceremonial marriage comes into existence by words in the present tense, uttered with a view and for the purpose of establishing the relation of husband and wife. *McGrath's Estate*, 319 Pa. 309, 179 A. 599 (1935). Cohabitation and reputation are not a marriage; they are but circumstances from which a marriage may be presumed, and such presumption may always be rebutted and will wholly disappear in the face of proof that no marriage has occurred. *Murdock's Es-*

tate, supra; *Craig's Estate*, 273 Pa. 530, 117 A. 221 (1922); *Balanti v. Stineman Coal & Coke Co.*, 131 Pa. Superior Ct. 344, 200 A. 236 (1938). In the instant case, the lower court believes that the substantial evidence of reputation and cohabitation should be disregarded because the words spoken by the appellant's husband were not in the present tense, and hence rebutted the presumption of a marriage. We cannot agree with such overly technical adherence to a "black letter" rule.

The tenuous distinction *verba de praesenti* and *verba de futuro* has long been the subject of criticism.[2] The decisions seeking to distinguish *verba de futuro* from *verba de praesenti* "compel the belief that the distinction is theoretical and utterly unrealistic. If the distinction is to be preserved, there should be borne in mind the obvious truth that although words are the means of expressing the intention of the parties, nevertheless they are not the exclusive means by which intention may be

2. See Freedman, *Law of Marriage and Divorce in Pennsylvania* §52: "The eminent legal historians, Pollock and Maitland, justly criticize the distinction between the present and future tenses: 'The scheme at which . . . [the canonists] thus arrived was certainly no masterpiece of human wisdom. Of all people in the world lovers are the least likely to distinguish between the present and the future tenses . . . The union which had existed for many years between man and woman might with fatal ease be proved adulterous and there would be hard swearing on both sides about "I will" and "I do." ' Martin Luther earlier protested: 'They have played a regular fool's game with their *verbis de praesenti vel futuro*. With it they have torn apart many marriages which were valid according to their own law, and those which were not valid they have bound up . . . Indeed I should not myself know how a churl . . . would or could betroth himself de futuro in the German tongue; for the way one betroths himself means *per verba de praesenti*, and surely a clown knows nothing of such a nimble grammar as the difference between *accipio* and *accipiam;* therefore he proceeds according to our way of speech and says: "I will have thee," "I will take thee," "thou shalt be mine." Thereupon "yes" is said at once without more ado.' " (footnotes omitted)

conveyed. . . . The setting in which the words are uttered, more strongly than any delicate shading in grammar, reveals the intention of the parties. On this principle rather than by a pedantic examination of the meaning of the words of a lay witness, the decision in Murdock's Estate[3] is justified. . . ." Freedman, supra, §53 at 120-21.

3. In *Murdock's Estate*, 92 Pa. Superior Ct. 275 (1927), an alleged widow attempted to claim a credit on the inheritance tax due on the bequest to her from Murdock. It was admitted that no ceremonial marriage was ever performed. The evidence as to cohabitation and reputation was conflicting. The claimant testified that the decedent would not consent to a marriage because his mother would object. She testified, however, that the decedent had said, "Will you be good to me?" To this the claimant replied, "Yes, I will do everything that a wife is supposed to do." These words were held to be insufficient. The court reasoned: "Notwithstanding the divergent testimony, there was probably sufficient evidence, if believed, to sustain a presumption and a consequent finding that the parties were married, if the evidence had been confined to cohabitation and reputation. But the claimant testified to the precise form of the contract of marriage between her and the decedent, and by this she must stand or fall. If the alleged conversation constitutes a contract of marriage [between her and the decedent], evidence of cohabitation and reputation is received in corroboration of her testimony that a marriage contract was in fact entered into. But if she herself proves that no valid marriage contract was actually entered into between them, evidence as to cohabitation and reputation goes for nothing: Tholey's App., 93 Pa. 36, 38; Grimm's Est., 131 Pa. 199, 202." *Murdock's Estate*, supra, at 277. The Court reasoned that here there was an agreement to create the pretense of a marriage, not to be married. The woman had agreed to enter into a meretricious relationship. She had not assumed the obligations of a wife and hence could not claim the benefits of a wife conferred by the laws of the Commonwealth.

Similarly, in *Tholey's Appeal*, 93 Pa. 36 (1880), the Court reasoned that the words, "he will claim me as his wife, take care of me and the children" were not sufficient to establish a marriage contract, but rather showed an intent to enter into a meretricious relationship and to masquerade as a married couple.

In *Grimm's Estate*, 131 Pa. 199, 18 A. 1061 (1890), a widow seeking to take from decedent intestate, testified that she and the

It is unquestioned that our courts will give effect to the intention of the parties and find a valid marriage where no direct testimony is offered as to the precise words of the marriage contract. *Chambers v. Dickson*, 2 S. & R. 475 (1816). In *Commonwealth v. Haylow*, 17 Pa. Superior Ct. 541, 547-48 (1901), the Court said:

decedent lived together for a week before his demise and that they intended to celebrate a ceremonial marriage on a date one week after his fatal accident. The Court held that this proved an intent to be married in the future and hence rebutted the presumption of marriage.

In *Craig's Estate*, 273 Pa. 530, 117 A. 221 (1922), a claim against the estate by the child of decedent's son was denied because of the child's illegitimacy. The invalidity of the common law marriage was based on facts and circumstances which suggested an illicit relationship rather than a marriage. The decedent and appellant's mother had maintained a secretive relationship over a sustained period of time. The quoted words indicated an intention to perpetrate a ruse rather than establish a marital relationship. The subsequent cohabitation and reputation were consistent with the ruse not a relationship of marriage. The Court ruled that the evidence of the appellant was insufficient to overcome the heavy burden on a party seeking to take from a decedent on an alleged contract.

In *Baker v. Mitchell*, 143 Pa. Superior Ct. 50, 51-52, 17 A.2d 738 (1941), the Court held that the words, "Well, he asked me if I would become his wife and I said I would. Then we agree [sic] to be man and wife ... that he would become my husband and I would become his wife," were insufficient in view of plans, which appellant testified to, that the parties intended to celebrate marriage at a future date.

Likewise, in *Nikitka's Estate*, 346 Pa. 63, 29 A.2d 521 (1943), the admission on cross-examination that appellant had proposed marriage and that the decedent had refused to enter into a marriage was held fatal to the existence of a common law marriage proven by reputation and cohabitation.

In short, the consistent theme of these cases appears to be an effort on the part of the Courts to distinguish meretricious relationships from valid common law marriages on the basis of the presumed intent of the parties inferred from their conduct, words and representations to others.

"It is true that the parties did not use the formal words of the marriage ceremony, nor was it necessary that they should do so, if each so understood the relation into which they were about to enter, and their words, fairly interpreted, show that they then and there mutually consented to it. With us marriage is a civil contract, which may 'be completed by any words in the present time without regard to form' (Hantz v. Sealy, 6 Bin. 405), the essential to its validity being the consent of parties able to contract: Richard v. Brehm, 73 Pa. 140, and cases there cited. See also Comly's Est., 185 Pa. 208, and Drinkhouse's Est., supra. 'Society rests upon marriage, the law favors it,' and in a country where it is often unattended by ceremony, or even officiating witnesses, it is not the duty of the courts to seek for an interpretation of the words used by the parties which would be inconsistent with an honorable intention as well as with their subsequent conduct and declarations, when an interpretation consistent with the formation of an honorable relation is possible, and, in the light of all the circumstances, more probably expresses their intention." The mandate to search for the intent of the parties is just as true in cases in which testimony is given as to the words used by the parties as when such testimony is absent.

In *Comly's Estate,* 185 Pa. 208, 210, 39 A. 890 (1898), the following exchange occurred: "Would you be willing to marry me in this way, that you and I are to live together until death separate us; I take you to be my wife, and you take me to be your husband?" She replied: "Yes, sir; until death separate us." Then the decedent asked: "Are you willing for that?" The claimant answered: "I guess I would be; but don't you think we had better be married by a minister?" The decedent replied: "It is just as lawful in this state as if we were married by a minister; . . . do what is right; but if we live together and do what is right, we are just as lawfully married as

if a dozen ministers married us." Despite the fact that these words might have been construed as a proposal of marriage rather than words expressing a present intent to be married, the Court held that under the circumstances the parties evidenced a present intent to enter into a marriage.

In *Neafie's Estate,* 12 Dist. 749 (1903), cited with approval in *Wagner Estate,* 398 Pa. 531, 537-8, 159 A.2d 495 (1960), the parties were married by a magistrate and lived together for about two years. They were then divorced and lived separately for a year. At the request of the husband, the parties met in Camden, New Jersey, where he said: "I am willing to take you back as my wife if you are willing to take me back as your husband." She said: "Yes." They then lived together at her house until his death. These words taken together with their actions and the evidence of cohabitation and reputation were sufficient to establish the marriage.

The Court in *Ward's Estate,* 296 Pa. 20, 23, 145 A. 676 (1929), reasoned that although the words used were clearly in the future tense, it would be absurd to disregard the manifest intent of the parties under the circumstances and as evidenced by their conduct. Jack Ward had proposed marriage to Helen several times and she had refused. In the presence of witnesses the following exchange occurred: "Helen, when are we going to get married so we can take this trip? Helen, will you be my wife?" Helen replied: "Yes, Jack, I will." He then said: "All right; from this time on consider yourself my wife." They then started living together without more. The marriage was held valid.

The Court in *Brown v. Nolen,* 298 Pa. 384, 387, 148 A. 498 (1930), recognized that the words testified to by the witnesses were not strictly speaking in the present tense, but sustained appellant's contention of the existence of a valid marriage saying: "The intention of the parties may not be disregarded. The words used to for-

mulate the marriage contract express a present intent to create an immediate relation of husband and wife."

Flora C. Seifert testified that her marriage to William H. Seifert was based on an alleged conversation between William, his mother and herself. William supposedly said: "Flora and me are going to be married." Then taking Flora's hand, he continued, "Now, Flora, I am going to take you for my lawful wife forever, as long as the both of us live." And she replied, "Well, now, William, I am going to marry you and take you for my lawful husband as long as we both live." This testimony, taken with the evidence of immediate cohabitation and of reputation were held sufficient to establish a valid marriage. *Seifert's Estate,* 302 Pa. 447, 449, 153 A. 722 (1931).

The Court in *Caddy v. Johnstown Fireman's Relief Association,* 129 Pa. Superior Ct. 493, 499-500, 196 A. 590 (1938), found the words, "We can live together as common law people," sufficient to establish a valid marriage, saying: "Unlettered persons frequently become confused in the use of tenses and it is difficult to get them to testify to the exact language used in a conversation, in words of the first and second person and using the present tense, rather than their understanding of its import, in words of the third person and using the past tense; but when it is considered that the parties had started on their way to get married that day, and had been interrupted by an accident, we think the testimony of the plaintiff, instead of establishing that no marriage contract was made between them, is entirely consistent with a finding that the parties agreed and consented then and there to become husband and wife and live together in that relation, without a marriage ceremony, and that following that agreement they cohabited together as husband and wife and were generally recognized and reputed to be such, until his death." (Citations omitted). See also, *Ksionska v. The Philadelphia & Reading Coal & Iron Co.,* 169 Pa. Superior Ct. 439, 82 A.2d 505 (1951) ;

*Wydra v. Philadelphia & Reading Coal & Iron Co.,* 153 Pa. Superior Ct. 529, 34 A.2d 326 (1943).

It is true that the courts have in the past looked upon common law marriage with a somewhat jaundiced eye. "The law of Pennsylvania *recognizes* common law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, they are to be *tolerated, not encouraged;* the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife. . . ." *Baker v. Mitchell,* 143 Pa. Superior Ct. 50, 54, 17 A.2d 738 (1940). Courts are properly skeptical of the claims of a surviving common law spouse which may rest on testimony designed to elevate the casual or illicit affair to the level of the legally recognized estate of marriage. But such suspicion should be lessened in cases such as the instant one where both parties are alive and competent to testify as to their words, conduct and intentions.

Furthermore, the instant case may properly be distinguished from those cases in which the alleged marriage is a first marriage between the parties rather than a remarriage. Commenting on this difference, our Supreme Court said: "These doctrines [referring to the judicial hostility to claims predicated on common law marriage] are familiar enough. We are, however, not dealing with a first marriage but with a remarriage following divorce after twenty years of wedlock. In such case we think that the law's role of mere toleration of the common law relationship should be reversed and the status of remarriage favored, even if acquired with common law informality. If the law allows a spouse, in the generous amount of nine reasons, to establish by divorce that the marriage was a mistake, it should be at least equally eager to let both spouses discover that their divorce was also a mistake. We regard it better to encourage remarriage than to leave such parties under judicial edict that they were

living sinfully together for ten years. . . . Thus there is a decree on the books that decedent had a meretricious relationship with his former wife, a result technically possible but unusual enough to warrant avoiding it, in the interest of the repose of morals, if reasonably feasible to do so." *Wagner Estate,* 398 Pa. 531, 533-4, 159 A.2d 495, 497 (1960) ; see also, *Commonwealth ex rel. Rubin v. Rubin,* 201 Pa. Superior Ct. 517, 193 A.2d 639 (1963). "Remarriage is sufficiently rare in human affairs to justify regarding it as *sui generis. . . ." Wagner Estate,* supra, at 534, 159 A.2d at 497. "To deny the status of marriage, let alone a remarriage, because words in the present tense cannot be proved, would be a clear injustice. It may even be said that certain acts may speak as loudly as words." 398 Pa. at 536, 159 A.2d at 498 (citing with approval *Caddy v. Johnstown Fireman's Relief Association,* discussed supra).

A review of the testimony in the instant case reveals that appellant and her former husband intended to establish the legal relation of husband and wife when he returned to her in June of 1967. The parties discussed this in letters exchanged prior to his return. Mr. McDermott's words, when considered in the context of the situation, express a clear present intent to resume the marriage. Their subsequent cohabitation and holding out to others is corroborative of this intent. The fact that certain policies and pension plans were continued or established with appellant as beneficiary points to this conclusion. Mr. McDermott and appellant filed joint tax returns claiming the status of marriage and signed sworn statements to this effect. Appellant's son and neighbor corroborated the fact of the marriage by testimony as to the parties' reputation in the community—a reputation which Mr. McDermott fostered. To permit Mr. McDermott to escape the responsibilities of support simply because appellant, a woman whose native tongue was not English and whose lack of familiarity with the

subtleties of the language is apparent from the record, could not clearly remember words in *verba de praesenti* being spoken smacks of sterile formalism. We believe that the testimony below was sufficient, if believed, to establish a common law marriage and appellant's right to be supported as a wife. Further, we believe that the court below did not take proper cognizance of the fact that this was a common law "remarriage."

The order of the lower court is reversed, and the case is remanded for proceedings consistent with this opinion.

DISSENTING OPINION BY JACOBS, J.:

This case presents the unusual issue of whether a valid common law marriage was entered into by the parties who had previously been married and divorced.

Maria J. McDermott, appellant, and John R. McDermott were married in Mgladbach, Germany, on October 26, 1948. Two sons were born of the marriage before it was ended by divorce in Germany on October 11, 1966. Soon thereafter, appellant and her two sons took up a residence in Harrisburg, Pennsylvania. Appellant and Mr. McDermott continued to correspond and in June of 1967, Mr. McDermott arrived at appellant's home. According to appellant, after he entered her residence he stated: "Here I am. You want to be my wife again?" Appellant responded: "Yes." Notes of Testimony at 11.

Appellant testified that after that moment they lived together as husband and wife for almost five years. Appellant further testified that for several years they filed joint tax returns and that her husband had told her that she was a beneficiary under a pension plan. On cross-examination appellant again testified as to what Mr. McDermott said when he arrived at the house: "Here I am, your husband. Will you be my wife?" According to appellant, she replied: "Yes." Notes of Testimony at 24.

Steven Albert McDermott, the parties' oldest son, testified that his mother had introduced his father more than once to the neighbors in Harrisburg as her husband. Steven also stated that his father referred to his mother as his wife on rare occasions. According to Steven, the people in the neighborhood considered his parents as married although he felt that having the same last name had a lot to do with it. Notes of Testimony at 28-34.

A neighbor testified that appellant had introduced her to Mr. McDermott as her husband and that everyone in the neighborhood thought the parties were husband and wife. However, the neighbor admitted that she never heard Mr. McDermott introduce appellant as his wife. Notes of Testimony at 35-37.

In September of 1972, Mr McDermott left the house but continued to support appellant and one son who was living with his mother. Two years later, however, Mr. McDermott's employment was terminated and the amount given to appellant and her son for support decreased substantially. Appellant accordingly commenced the present support action. After the taking of testimony had been completed, the lower court found as a fact that no common law marriage existed because the words allegedly uttered by the parties were not in the present tense as required to form a common law marriage. No support was granted to appellant although an order of $50.00 a week was entered for the son who was still living with his mother. Appellant now argues that the evidence was sufficient to establish a common law marriage. I disagree with the conclusion of the majority and would affirm the order of the court below.

"A common law marriage is established by words in the present tense, uttered with the view and for the purpose of establishing the relation of husband and wife." *Gower Estate*, 445 Pa. 554, 556, 284 A.2d 742, 743 (1971). "The subsequent cohabitation and reputation of marriage are evidence from which a marriage may be inferred

but do not of themselves constitute a marriage. A presumption arising from reputation and cohabitation will give way to positive evidence that no contract was made. If a litigant offers evidence of the marriage contract itself, the result must depend on the sufficiency of that evidence, and evidence as to cohabitation and reputation are of no avail." *Wilkinson v. Bethlehem Mines Corp.*, 180 Pa. Superior Ct. 546, 549, 119 A.2d 564, 565 (1956). *See also Nikitka's Estate*, 346 Pa. 63, 29 A.2d 521 (1943) ; *Rager v. Johnstown Traction Co.*, 184 Pa. Superior Ct. 474, 134 A.2d 918, *allocatur refused*, 184 Pa. Superior Ct. *xxvii* (1957) ; *Ksionska v. The Phila. & Reading Coal & Iron Co.*, 169 Pa. Superior Ct. 439, 82 A.2d 505 (1951).

The thrust of appellant's case is that she and Mr. McDermott entered into a contract of remarriage upon his arrival at her residence. However, the words allegedly used were: "You *want* to be my wife again?" or "Will you be my wife?" I agree with the lower court that these words do not demonstrate a present intent between the parties to form the union of marriage. Instead they indicate the willingness of appellant to become Mr. McDermott's wife at some future time rather than right at that moment.

In *Pierce v. Pierce*, 355 Pa. 175, 178, 49 A.2d 346 (1946), our Supreme Court held that the words "I will take you for my wife" and "If that is the case, I will take you for my husband," followed by cohabitation and reputation of marriage were insufficient to establish a common law marriage. In contrast the words found in *Blecher Estate*, 381 Pa. 138, 140, 112 A.2d 129 (1955), "You are my wife; I am your husband" and "You are my husband and I am your wife," demonstrated words of the present tense establishing a common law marriage.

I am aware of the cases cited by appellant which favor the status of remarriage, even if acquired by common law informality. *See Wagner Estate*, 398 Pa. 531, 159 A.2d 495 (1960) ; *Blecher Estate*, supra; *Com-*

**556**

*monwealth ex rel. Rubin v. Rubin,* 201 Pa. Superior Ct. 517, 193 A.2d 639 (1963). For the following reasons, however, I find these cases distinguishable from the present case. In *Wagner Estate,* the common law marriage was proven by clear evidence of cohabitation and reputation of marriage. No evidence was presented of contractual words between the parties because of the restriction of the Dead Man's Act, May 23, 1887, P.L. 158, §5, 28 P.S. §322. In *Blecher Estate,* the words uttered between the parties were: "You are my wife; I am your husband . . . ." and "You are my husband and I am your wife." These words clearly demonstrate words in the present tense establishing the relationship of husband and wife. In *Commonwealth ex rel. Rubin v. Rubin,* the evidence of cohabitation and reputation of marriage created the presumption of marriage which was not rebutted by any positive evidence that a contract had not been made.

In short, appellant attempted to prove a remarriage by words exchanged between the parties in June of 1967. Appellant's case must rise or fall on whether an actual marriage was at that time created.[1] *See Rager v. Johnstown Traction Co.,* supra. No matter which version of appellant's testimony is considered, I must conclude

---

1. I would also like to add that in my opinion the evidence presented by appellant was not sufficient to prove reputation of marriage. That evidence consisted of the statements of appellant about income tax returns and insurance policies, the testimony of appellant's son, and the testimony of one neighbor who admitted that she never heard the husband refer to appellant as his wife. " 'The mere fact that they [the alleged contracting parties] were known to a few people as man and wife is not sufficient evidence to establish marriage. Proof of reputation for such purpose must be general and not confined to a few persons in the immediate neighborhood, as the relationship may be established merely for the purpose of deceiving others.' " *Nikitka's Estate,* 346 Pa. 63, 66, 29 A.2d 521, 523 (1943), *quoting Hilton's Estate,* 263 Pa. 16, 19, 106 A. 69, 70 (1919).

that the words "*Will* you be my wife?" or "You *want* to be my wife?" are insufficient to establish a common law marriage.

I would affirm the order of the lower court.

VAN DER VOORT, J., joins in this dissenting opinion.