448 A.2d 25

**In the Interest of Melissa MILLER, Dependent.**

**Appeal of Melissa MILLER and Edward Christoph.**

Superior Court of Pennsylvania.

Argued March 16, 1982.

Filed July 2, 1982.

512

Carmela R. M. Presogna, Assistant Public Defender, Erie, for Melissa Miller, appellant.

Dennis V. Williams, Erie, for Edward Christoph, appellant.

Stephen A. Tetuan, Erie, for mother, participating party.

Dana S. Jones, Assistant District Attorney, Erie, for Commonwealth, participating party.

Before SPAETH, JOHNSON and HOFFMAN, JJ.

SPAETH, Judge:

This is an appeal from an order declaring appellant's common law marriage invalid and adjudging her a dependent child. We reverse.

At the time the events in question occurred, appellant was fourteen years old and a student in the eighth-grade. She lived with her mother in Erie. Her English teacher was one Edward Christoph, who was thirty-six years old. Early in the fall of 1980, appellant and Mr. Christoph became romantically involved. Sometime in October of 1980, appellant's mother found two letters from Mr. Christoph to appellant; they were affectionate in nature, saying "I love you" and "[t]hings of that nature." N.T. 8/4/81, 48. Appellant's mother confronted appellant with the letters and forbade her to see Mr. Christoph. She also discussed the matter with the school authorities, and appellant was later transferred from Mr. Christoph's English class. However, appellant continued to see Mr. Christoph, by sneaking out of the house from time to time.

During this time, appellant's relationship with her mother became turbulent,[1] and on April 10, 1981, appellant ran away

1. As the dissent points out, appellant is not directly challenging the lower court's findings as to her incorrigibility and we, therefore, do not decide this issue. However, we are unable to agree with the dissent that appellant is "otherwise incorrigible," Dissenting Opinion at 36, and that she committed acts of "habitual disobedience," id. 38. On the contrary, the record demonstrates that appellant's behavior

and was placed by Children's Services of Erie County at the home of her aunt and uncle. In July, appellant ran away from their home and was later found at Mr. Christoph's home. On July 17, after a brief stay in a foster home, appellant returned to her mother's home to live. On July 21, 1981, at about 3:00 a. m., appellant met Mr. Christoph and entered into a common law marriage with him at the home of his sister and brother-in-law, who served as witnesses to the marriage.

Appellant's mother is opposed to the marriage. On July 22, 1981, she filed a petition alleging that appellant was a dependent child. The lower court ordered appellant detained at a foster home, and on August 4, after an adjudication hearing, adjudged her dependent and ordered that she "not have contact in any manner" with Mr. Christoph. This appeal is from that order.

During the adjudication hearing the lower court correctly stated that

> [i]f in fact there is a marriage [of appellant and Mr. Christoph], then she [appellant] would no longer be under the responsibility and care of the mother. Therefore, the basis for the [dependency] petition would fail.
> . N.T. 60.

In its opinion, filed in response to this appeal, the lower court did not question the testimony that appellant and Mr. Christoph had by words in the present tense expressed their intent to marry one another, as required if parties are to

related entirely to her desire to see Mr. Christoph, and that all of the rules she disobeyed concerned him. Appellant's mother testified:

> THE COURT: Is it your contention that all the problems you have had with Melissa have incurred [*sic*] because she has been involved with Mr. Christoph, is that correct?
> THE WITNESS: Yes.
> N.T. 23.

Her mother also testified that an example of one of the rules appellant broke was "not to meet him." *Id.* 21–22. Appellant's frequent disappearances from her home and her aunt's home also were due to her meetings with Mr. Christoph, as was the lying associated with these meetings. *Id.* 12–16. Thus, the record does not support the dissent's view that appellant was "otherwise incorrigible" or "habitual[ly]" disobedient.

enter into a common law marriage.[2] *Commonwealth v. Sullivan*, 484 Pa. 130, 398 A.2d 978 (1979); *Stauffer Estate*, 372 Pa. 537, 94 A.2d 726 (1953). The court held, however, that appellant's marriage to Mr. Christoph was invalid because "one of Mr. Christoph's express motives in marrying Melissa Miller [appellant] was to avoid criminal prosecution." Slip op. at 3–4. Said the court:

Mr. Christoph testified that at the time the alleged marriage occurred, he was aware that the District Attorney's Office was contemplating filing criminal charges against him based on his sexual involvement with the minor, Melissa. (Tr. 65). Upon learning that he was the subject of a criminal investigation, Mr. Christoph consulted an attorney who advised him of the requisites for a common law marriage (Tr. 73–74).

Virginia Byers, Mr. Christoph's sister and a witness to the alleged marriage ceremony, testified that one of Mr. Christoph's express motives in marrying Melissa Miller was to avoid criminal prosecution (Tr. 84–86).

The Court finds it abundantly clear that Mr. Christoph's purpose in uttering the words "I will marry you" was to prevent Melissa from appearing as a witness against him in a criminal proceeding. And, this Court will no more condone fraudulent behavior of this sort in a common law marriage than it would in any other marriage.

Slip op. at 3–4.

The court also said that Mr. Christoph's "sole purpose [in getting married] was to perpetrate a fraud upon this Court and Melissa Miller." Slip op. at 4.

■ When we review a decision by a lower court, we must accept findings of fact supported by the evidence, for the lower court is in a much better position than we are to resolve conflicts in the evidence and issues of credibility. However, we are not bound to accept findings not supported by the evidence; nor are we bound to accept the lower

**2.** Appellant was above the age of consent to common law marriage, which is seven. *Jewett v. Jewett*, 196 Pa.Superior Ct. 305, 175 A.2d 141 (1951).

court's inferences from the evidence, or its conclusions of law. *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412 (1981); *Hankin v. Hankin*, 279 Pa. Superior Ct. 179, 420 A.2d 1090 (1980).

Here, we have encountered some difficulty in accepting the lower court's statement of Mr. Christoph's motive in entering into the marriage. Although the court stated that it found it "abundantly clear" that Mr. Christoph's motive was "to prevent [appellant] from appearing as a witness against him in a criminal proceeding," slip op. at 4, the evidence is, at the least, equivocal.

Mr. Christoph testified that his motive was that appellant should "be my wife" and that his understanding, when he told her this, was that no criminal charges were going to be brought against him:

Q. What did you say to Melissa before the persons present at the Byers' home on that occasion?

A. I said, "I marry you, Melissa."

Q. You say, I marry her?

A. Yes.

Q. And what did you intend when you said you married her?

A. I intended that she be my wife.

Q. And as your wife what was your intention towards her?

A. To take her home to live with me as my wife.

Q. Did you recognize any responsibility when you said those words?

A. Yes.

Q. What were the responsibilities that you recognized?

A. To take her, provide a home and all the necessities that you would normally provide for your wife.

\*     \*     \*     \*     \*     \*

Q. Mr. Christoph, at the time this alleged marriage is to have taken place between you and Missy, do you know—were you aware of the fact that the police were investigating you?

A. I had talked to the police at the time, yes.

Q. Were you afraid that charges would be filed against you by the police as a result of your involvement with Missy?

A. No.

Q. You were not afraid of that?

A. No.

Q. The crime, corrupting the moral[s] of minors, have you ever heard of that at the time you got married to Missy?

A. Yes, I did.

Q. Did you have any concerns at the time this alleged marriage is to have taken place with you being charged by the police?

A. No.

Q. Why not?

A. Because when I talked to Detective Slupski he said no charges would be brought.

Q. Isn't it a fact you got married to Missy to prevent her from testifying against you and as a result you wouldn't have to face criminal charges?

A. No.

Q. Isn't that a fact?

A. No, it is not.

\* \* \* \* \* \*

THE COURT: As far as the police investigation, you were aware of that because you talked to a police officer?

THE WITNESS: Yes, I did.

THE COURT: And you spoke to him about the charge of corrupting the morals of a minor?

THE WITNESS: Yes, I did.

THE COURT: And how did that come about?

THE WITNESS: I don't understand the question.

THE COURT: How did you speak to him? Did you go down to speak to him?

518

THE WITNESS: He said he wanted to talk to me at a certain time.

THE COURT: What happened?

THE WITNESS: We discussed the charges and he asked me questions about what had happened and at the end of the conversation he said he was going to recommend to the D.A. that no charges be brought.

THE COURT: When did this occur?

THE WITNESS: I really don't know the day. It was a week maybe a week and a half before we got married.

N.T. 63–64, 65–66, 72–73.

It is true, as the lower court states in its opinion, that Mr. Christoph's sister, Virginia Byers, who was a witness to the marriage ceremony, testified that "one of Mr. Christoph's express motives in marrying Melissa Miller was to avoid criminal prosecution." Slip op. at 3–4. However, the sister also testified that another of Mr. Christoph's motives was that he loved appellant:

Q. [on cross-examination by counsel for appellant's mother]: Did that strike you as strange that he [Mr. Christoph] wanted to marry such a young girl that use[d] to be a student of his?

A. A little bit, but he said he loved her, so—

Q. Was there any more of a discussion than that, other than the fact that he loved her and wanted to take her as his wife?

A. What do you mean, sir?

Q. Was there any discussion as to any other reasons or any other motives as to why he wanted to marry her, other than love?

A. Well, I think there were some legal problems.

Q. What legal problems?

A. Her—Melissa's mother didn't approve of the situation.

Q. What other legal problems?

A. I don't know. Possibly that—I guess, maybe, he would go to jail.

Q. Go to jail for what?

A. Let me think of what the term is.

Q. Corrupting the morals of minors?

A. Yeah, that's what I'm trying to think of—say.

Q. Is that what you are talking about?

A. That crossed his mind.

Q. Did he think Melissa—

A. A little bit.

Q. How?

A. I guess if they were married, you know—

Q. Did he express that in words?

A. That he thought they would do that?

Q. Yes. Did he express that by marrying Missy, he would avoid criminal prosecution?

A. Yes.

Q. When was this discussed with your brother?

A. About the criminal charges? That would—

Q. Yes.

A. —that would have been Saturday morning.

Q. That would have been two or three days prior to the marriage?

A. That is correct.

Q. And in discussing these things with him, what was first mentioned as for his reasons for wanting to get married?

A. His first reasons—uh—

Q. Did he give a priority?

A. No, not really.

## REDIRECT EXAMINATION

BY MR. KOWNACKI:

Q. This was a general discussion with you?

A. Right.

Q. Did he appear sincere in his stated reasons for love?

A. Yeah. I was surprised, but yeah, he was serious.

Q. You have known your brother for how long?

A. Twenty-five and a half years.

Q. You had a relation—good close relationship with him?

A. Yes.

Q. You feel you know your brother well?

A. Very well.

Q. Therefore, you know him when he is sincere and insincere?

A. Yeah.

Q. He indicated he loved Melissa and wanted to marry her, you felt he was sincere?

A. Yes, I did.

N.T. 84–87.

The lower court does not mention this portion of the sister's testimony. It seems to us that the fairest inference to be drawn from the evidence is that Mr. Christoph may have had at least two motives for marrying appellant—his love for her, and his desire to avoid criminal prosecution for his relationship with her. We find no support in the record for the lower court's assignment of priority to the second of these motives.[3]

█ We may, however, put aside any difficulty with the inferences drawn by the lower court. Accepting the lower court's finding that Mr. Christoph married appellant to avoid criminal prosecution, still, we are unable to uphold its order. For contrary to the court's opinion, such a motive does not invalidate a common law marriage.

The controlling decision is *Estate of Gower*, 445 Pa. 554, 284 A.2d 742 (1971). In *Gower*, as here, the parties had by words in the present tense expressed their intent to marry one another. The lower court nevertheless held the marriage invalid because the appellant's motive in entering into the marriage was to avoid conscription for military service.

3. The inquiry here is similar to that which occurs frequently in the area of labor law, where it is important to determine an employer's "actual motivation" in firing an employee. It is unlawful to fire an employee in retaliation for his union activities, but lawful to fire him for "good cause." The courts have struggled with this inquiry in so-called "mixed motive" cases. *See Herman Brothers, Inc. v. National Labor Relations Board*, 658 F.2d 201 (3rd Cir. 1981).

Reversing, the Supreme Court held that "[t]he reason or motive underlying a decision to marry is not relevant to a finding of the *intention* to marry." *Id.*, 445 Pa. at 557, 284 A.2d at 744. (emphasis in original). Therefore, the appellant's motive to avoid conscription could not "render[ ] invalid his otherwise valid common law marriage." *Id.*

The record here establishes—and the lower court did not question—appellant's and Mr. Christoph's *intention* to marry.[4] The fact—as the lower court found it to be—that Mr. Christoph's *motive* was to avoid prosecution could not render invalid their otherwise valid common law marriage.

There is one further aspect of the lower court's decision that requires consideration. Having held—erroneously, as we have just discussed—that Mr. Christoph's motive invalidated the marriage, the court went on to say:

> Which brings us to the next issue—whether the validity of this marriage can only be challenged by one of the parties in an action for divorce in annullment.

**4.** The dissent is concerned that we have focused on Mr. Christoph's intent in entering into the marriage with appellant to the exclusion of considering appellant's intent. Dissenting Opinion at 35. Partly for this reason, the dissent finds no express agreement between the parties to marry, and states that "the record is devoid of any testimony concerning meaningful discussions between the parties regarding the marriage prior to the ceremony itself." *Id.*

We have focused on Mr. Christoph's intent in response to the lower court's opinion, which questioned only Mr. Christoph's intent to marry, and also, in response to counsel's arguments. The lower court accepted as fact that appellant intended to marry Mr. Christoph, and until the dissent, the genuineness of her intent has not been doubted. This is not surprising, for there is more than ample proof in the record that appellant intended to marry Mr. Christoph, and that the two had discussed marriage before the ceremony. Appellant testified that she and Mr. Christoph discussed marriage from as early as December 1980, about seven months before the ceremony. N.T. 97. She also testified that marriage was "both" her idea and Mr. Christoph's, *id.*, and that she intended to become his wife at the ceremony, and still wished to be married to him, *id.* 96. Her testimony was corroborated by Mr. Christoph, who testified that "we had talked about getting married for several months." N.T. 68. Mr. Christoph also testified that he discussed in advance his intention to marry appellant with her mother, who said "that was impossible," N.T. 73, and that it was after this discussion that he "talked to my attorney and was advised of the laws of the state of common law marriage." *Id.* 73–74.

Invalid marriages are of two types: void and voidable. A void marriage is subject to collateral attack and its validity may be challenged in any legal proceeding wherein it is pertinent. *Faivre v. Faivre*, 182 Pa.Super. 365, 128 A.2d 139 (1957). See, also, 23 P.S. Section 204(b).

Under the new *Divorce Code*, 23 P.S. Section 204(a)(3) where one party to the marriage lacks the requisite assent the marriage is void. We find that Mr. Christoph lacked the requisite intent to assent to a valid marriage and that his sole purpose was to practice a fraud upon this Court and upon Melissa Miller. Thus, this Court holds that it had the power to adjudicate the validity of Melissa Miller's common law marriage in the course of adjudicating her status as a juvenile.

Slip op. at 4.

We cannot agree with this reasoning.

It is true that there is a distinction, in both the common law [5] and the Pennsylvania Divorce Code, Act of April 2, 1980, P.L. 63, Act No. 26, 23 P.S. § 101 *et seq.*, between a void marriage and a voidable marriage. The Code provides the following grounds for annulment or invalidity of void marriages, in Section 204:

**(a) Where there has been no confirmation by cohabitation following the removal of an impediment, the supposed or alleged marriage of any person shall be deemed void in the following cases:**

**(1) Where either party at the time of such marriage had an existing spouse and the former marriage had not been annulled nor had there been a divorce, except where such person had obtained a decree of presumed death of the former spouse.**

---

**5.** The distinction between a void marriage and a voidable marriage derives from the English ecclesiastical courts. A void marriage included unions so abhorrent as to be against public policy from their inception. Into this class belonged bigamous marriages and those in which one party was insane. Void marriages could be dissolved over the objection of the parties by interested persons. In contrast, voidable marriages contained some defect that could be removed by ratification, and were dissolvable only by the injured spouse. Perlberger, *Pennsylvania Divorce Code* § 3.2 (1980).

(2) Where the parties to such marriage are related within the prohibited degrees of consanguinity, which degrees are as follows:

A man may not marry his mother.

A man may not marry his father's sister.

A man may not marry his mother's sister.

A man may not marry his sister.

A man may not marry his daughter.

A man may not marry the daughter of his son or daughter.

A woman may not marry her father.

A woman may not marry her father's brother.

A woman may not marry her mother's brother.

A woman may not marry her brother.

A woman may not marry her son.

A woman may not marry the son of her son or daughter.

(3) Where either party to such marriage was incapable of consenting by reason of insanity or serious mental disorder, or otherwise lacked capacity to consent or did not intend to assent to such marriage.

(b) In all such cases of marriages which are void, the marriage may be annulled as set forth in section 203, or its invalidity may be declared in any collateral proceeding.

The Code provides the following grounds for annulment of voidable marriages, in Section 205:

§ 205. GROUNDS FOR ANNULMENT OF VOIDABLE MARRIAGES

(a) The marriage of any person shall be deemed voidable and subject to annulment in the following cases:

(1) Where either party to such marriage was under 16 years of age, unless such marriage was expressly authorized by a judge of the court.

(2) Where either party was 16 or 17 years of age and lacked the consent of parent or guardian or express authorization of the court and has not subsequently ratified such marriage upon reaching the age

of 18 and such proceeding for annulment is commenced within 60 days after the marriage ceremony.

(3) Where either party to such marriage was under the influence of intoxicating liquor or drugs and a proceeding for annulment has been filed within 60 days after the marriage ceremony.

(4) Where either party to such marriage still is and was naturally and incurably impotent at the time of such marriage, unless the condition was known to the other party prior to the marriage.

(5) Where one party was induced to enter into such marriage due to the fraud, duress, coercion, or force attributable to the other party, and there has been no subsequent voluntary cohabitation after knowledge of such fraud or release from the effects of fraud, duress, coercion, or forces.

(b) In all such cases of marriages which are voidable, either party thereto may seek and obtain an annulment of such marriage, but unless and until such decree is obtained from a court of competent jurisdiction, such marriage shall be valid and subsisting. The validity of such a voidable marriage shall not be subject to attack or question by any person if it is subsequently confirmed by the parties thereto or if either party has died.

Section 203 of the Code authorizes a proceeding for the annulment of both void and voidable marriages:

In all cases where a supposed or alleged marriage shall have been contracted which is void or voidable under this act or under applicable law, either party to such supposed or alleged marriage may bring an action in annulment to have it declared null and void in accordance with the procedures provided for under this act and the Rules of Civil Procedure.

By its citation of Section 204(a)(3) of the Code the lower court blurred the statutory distinction between void and voidable marriages. That section makes a marriage void only where one of the parties "lacked capacity to consent or did not intend to assent" to the marriage. Since

here neither party lacked capacity and both intended to assent, the section is inapplicable. The lower court's finding that "[Mr. Christoph's] sole purpose was to practice a fraud upon this Court and upon [appellant]" does not bring the marriage within Section 204(a)(3). For marriages induced by fraud are dealt with explicitly in Section 205(a)(5), which concerns *voidable* marriages.[6]

The distinction between a void marriage and a voidable marriage is not merely a matter of semantics. The Divorce Code, like the common law,[7] provides that a voidable marriage may be annuled only by "either party thereto" and is "valid and subsisting" "unless and until" challenged by one of them. Section 205(b); Perlberger, *Pennsylvania Divorce Code* § 3.2.3. (1980) ("the legislature has expressly declared this crucial distinction between void and voidable marriages by enactment of section 205(b)"). If indeed appellant was induced to enter into marriage by Mr. Christoph's fraud, their marriage is not, as the lower court held, void, but voidable. In that event, appellant may seek to have it annuled. Not only, however, does she not make such a request; she has appealed to this court asking that her marriage be upheld.

We have not overlooked the arguments of counsel for appellant's mother, urging that we re-examine the doctrine of common law marriage, and either abolish it or align the age of consent to that required for statutory marriage. However, we have declined previous opportunities to abolish or modify the doctrine of common law marriage. *See e.g., Buradus v. General Cement Products Co., supra* note 4.

6. We note that counsel for appellant's mother urges an entirely different reason for the application of section 204(a)(3), arguing that appellant lacked the capacity to consent to the marriage because she was under sixteen, as required by The Marriage Law, Act of Aug. 22, 1953, P.L. 1344, 48 P.S. § 1–1 *et seq.* However, the statutory age requirement is not applicable to common law marriages. *Buradus v. General Cement Products Co.*, 356 Pa. 349, 52 A.2d 205 (1949) (affirming on basis of Superior Court opinion at 159 Pa.Superior Ct. 501, 48 A.2d 883 (1946)). Appellant did not lack capacity to consent to a common law marriage. *See* footnote 1, *supra.*

7. *See* footnote 5, *supra.*

Past efforts in the Legislature to abolish common law marriage have failed. Freedman, 1 *Law of Marriage and Divorce in Pennsylvania,* § 50a (2d ed. 1957). The Marriage Law, Act of August 22, 1953, P.L. 1344, 48 P.S. § 1–23, explicitly preserves the right to contract a common law marriage, providing that "[n]othing herein shall be construed to change the existing law with regard to common law marriage." This remains the legislative intent, as may be seen from the fact that the Divorce Code of 1980 did not repeal this provision of The Marriage Law, although it did expressly repeal another provision.[8] *See* Perlberger, *Pennsylvania Divorce Code* § 2.5 (1980). For us to ignore so clear an expression of legislative intent would be an abuse of judicial power. If common law marriage is to be abolished, or the requirements for entering into it changed, it must be done by the Legislature, not the courts.

In conclusion, we wish to note that neither have we overlooked the anguish that this marriage has caused appellant's mother. We may hope that her fears are unfounded, as they may be, for the most devoted mother is sometimes mistaken about what is good for her child. But if we knew that the marriage would prove unhappy and short, that would not deflect us from our decision. Our responsibility is to interpret and apply the law. If a marriage is lawful, that is the end of our inquiry. For as judges, we are agents of the State, and whether a lawful marriage is happy or unhappy is none of the State's affair.

Reversed.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting:

The majority opinion would reverse the order of the lower court, which declared an attempted common law marriage

8. Clause (h) of Section 5 of The Marriage Law was repealed. This clause provided that no license to marry should be issued "to a person divorced by his or her former spouse on the grounds of adultery, for the marriage of such person to the person with whom the crime of adultery was committed, during the lifetime of the former husband or wife."

void and adjudged Appellant to be a dependent child based upon evidence of the Appellant's incorrigibility and her refusal to submit to parental control. Since I agree with the majority that our responsibility is to interpret and apply the law, and since I find that the facts appearing on the record in this juvenile proceeding clearly support the findings and disposition of the trial judge, I must respectfully dissent.

Although this matter arises as a dependency proceeding, and although the lower court's order adjudging Appellant dependent and further ordering her detention in a foster home is the ultimate decision for review on this appeal, I note that Appellant has not directly challenged the trial judge's findings as to incorrigibility either in her brief or on oral argument before this court.[1]  I will assume for purposes of this dissent that Appellant does not challenge the findings of the lower court as to her behavior up to the time of the bizarre ceremony by which Appellant seeks to escape the jurisdiction of the Erie County Common Pleas Court, Juvenile Division.

The learned trial judge is perfectly correct in observing that this case presents a troubling, but fortunately rare, situation.  The facts appear from the record as follows.

Melissa Miller, Appellant, was born October 15, 1966, and had not yet reached her fourteenth birthday when the events leading up to the dependency hearing began to unfold.  Edward Christoph, a professional employee of the School District of Erie, first knew Melissa about two years prior to the time of his testimony in these proceedings on August 4, 1981.  Melissa was a student of Christoph's in the eighth grade at the Wilson School where Christoph was employed to teach English.  Unfortunately, Christoph did

1.  In her Reasons for Appeal, filed September 11, 1981 pursuant to Pa.R.A.P. 1925(b), Appellant sets forth three reasons for the appeal; (1) the Master erred in finding the juvenile should be detained in a foster home, when a valid common law marriage was conclusively shown;  (2) the Court erred in voiding the marriage since only the parties may seek annulment under the New Divorce Act;  and (3) the Court erred in finding the juvenile dependent based on incorrigibility since responsibilities to a husband are "greater than" the legal commands of a parent.

not limit his contacts with the minor Appellant to matters properly included in an eighth grade English class curriculum or directed towards the improvement of her formal public school education.

In October or November of 1980, Melissa's mother discovered two letters on the kitchen table of her home sent by Christoph to Melissa. The letters contained phrases such as, "What we had was beautiful", "You gave yourself fully", and "I love you". When confronted with the letters, Melissa first denied any knowledge of them and then admitted that they had been written to her by Christoph. The mother immediately went to her sister's house and discussed the matter with her sister and brother-in-law. When she later returned to her residence, the letters were missing from her purse. The mother promptly brought the matter to the attention of the Erie public school officials, who took steps to transfer Melissa out of Christoph's class and expressly forbade the teacher, in writing, to have any contact whatsoever with Melissa. Unbeknownst to the mother or school officials, Christoph continued to see the minor Appellant. While admitting to the hearing judge that he had received a letter from his school principal saying that at no time was he to talk to, or have any dealings with, Melissa, he claimed to have honored that order, if at all, only during school hours since, in his view, "that's as far as the school district has any rights."

Melissa's mother testified that her problems with control of Melissa began early in the fall of 1980. Melissa would sneak out of the house through her bedroom window in the early morning hours and be away for three or four hours. At the dependency hearing, it was established through Melissa's testimony that a meretricious relationship had begun between Melissa and Christoph as early as November 1980, when Christoph, who was married at the time, would have been at least 35 years old and Appellant barely 14. The troubles which the mother was experiencing with Melissa continued, as hindsight would lead us to suspect, until Melissa ran away from her mother's home on April 10, 1981.

Christoph had secured a divorce from his wife on December 8, 1980 and took custody of his two children who, at the time of Melissa's dependency hearing, were only 12 and 13 years of age.

In April 1981, in an attempt to gain control over her daughter, Melissa's mother had Melissa placed in the custody of her aunt and uncle through the Children's Services of Erie County. While in their custody the aunt became concerned when, one day, Melissa had not traveled to the place to which she had been given permission. The aunt notified the mother who, while out searching for Melissa, observed her daughter coming out the front door of Christoph's home. The mother entered the home and confronted Christoph, who was in the residence with his 13-year-old daughter. As a result of that incident, the mother signed a voluntary entrustment agreement by which Melissa was placed in a foster home. After a brief stay, Melissa was returned to her mother's home.

Early on the morning of July 17, 1981, Melissa again slipped out of her home, through a bedroom window, and rendezvoused with a 13-year-old friend. They walked to Rosary School where Christoph picked the two minor girls up, following a telephone call by Melissa to him. Christoph transported both children to the residence of his sister and brother-in-law where, at 3:00 a.m., in the presence of the sister, brother-in-law and the 13-year-old friend of Melissa, Christoph and Melissa exchanged words which we are asked to dignify by finding them to be marriage vows. Within thirty minutes, Melissa left the home of Christoph's sister and, according to the sister, returned, alone, to her mother's home. At 5:00 a. m. the same morning, Melissa returned, by herself, and remained at the home of Christoph's sister who left for work at about 8:00 a. m. leaving Melissa alone in the residence. The following day, a dependency petition was filed by the mother and Melissa was picked up by the Erie police and removed to the James Cooney Foster Home. A detention hearing was held two days later and Melissa was remanded back to the Foster Home, pending the dependency hearing on August 4, 1981.

While it is clear from the record that Christoph had sexual relations with the 14-year-old Melissa on more than one occasion both during and after his marriage to another person, it is far from clear that either Melissa or Christoph sought to "consummate" their 3:00 a. m. "marriage" or even expressed any intention of assuming any relationship as husband and wife, prior to the discovery by the mother of this last instance of incorrigibility and the arrest of Melissa by the Erie police following the detention order of July 22, 1981.

In December, 1980, following his divorce from his wife under the statutory laws of this Commonwealth, Christoph consulted with his divorce lawyer about the elements of common law marriage in Pennsylvania. He again consulted with his lawyer about common law marriage "the following day after we [Melissa and he] were married to make sure that I had the instructions correct." The Erie police had talked to Christoph "several times from April until July" 1981 about his relationship with Melissa and his alleged corruption of the morals of Melissa. Although Christoph testified that two weeks before his attempted marriage he was assured that no charges would be brought against him, three days before the 3:00 a. m. "marriage" he told his sister that he believed his marrying Melissa would result in his avoiding criminal prosecution.

On July 16, 1981, Melissa had given a written statement to Detective Sergeant William Serafini of the Erie police which presumably detailed her sexual relationship with Christoph going back at least as far as November 1980. Melissa never discussed this statement with Christoph. Christoph never discussed with Melissa his consultations with his attorney regarding common law marriage and avoidance of prosecution other than to provide Melissa with "what you had to say [to perfect a common law marriage] and that's it".

It is on these facts that we are asked to overturn the lower court's finding that the 3:00 a. m. colloquy between a 14-year-old girl and a 36-year-old man did not rise to the stature of a valid common law marriage.

The majority focuses on *Gower Estate*, 445 Pa. 554, 284 A.2d 742 (1971) in concluding that once the *intention* to marry is established, one may not consider *motivation* in evaluating whether a valid common law marriage has been consummated. I view the facts in *Gower* to be at great variance with the facts in the instant case. In *Gower*, our supreme court was reviewing the lower court's orders confirming an auditor's recommendations that denied claims by the appellant seeking to elect to take against the will and secure a family exemption in his alleged wife's estate. The appellant and the decedent had begun living together in 1930, while decedent remained married to her first spouse. Two years later, the decedent had secured a divorce, and from 1932 to 1942 they [appellant and decedent] continued to live together. In 1942, both of them had executed a Selective Service form for the purpose of establishing marriage status, which status, if accepted by the Selective Service Board, would result in a deferred classification under the military draft laws. The parties continued to live together another twenty years following the execution of the Selective Service form and until decedent's death in 1962. The supreme court, in *Gower*, found the Selective Service form to contain sufficient language in the present tense, uttered with a view and for the purpose of establishing the relationship of husband and wife, to overcome the presumption of invalidity arising from the meretricious relationship, the obstacle of which had been removed some ten years earlier by virtue of decedent's divorce. The *Gower* decision, which involved the review of a relationship lasting over thirty years following the wife's divorce, affords little support, in my view, for the decision of the majority in the instant case.

This is so because in *Gower* one has no difficulty in finding not only the words *in praesenti* but, of equal importance, the clear intention and purpose of establishing the relationship of husband and wife. I agree with the majority that, in the instant appeal, Melissa and Christoph satisfied the law's requirement that words *in praesenti* be exchanged in order to create a common law marriage. This is not

surprising, given the fact that Christoph had consulted with his lawyer before the ceremony, and again the day following, to make sure his "instructions" had been correct. Marriage, even common law, requires more than that, however.

The lower court correctly listed the *three* elements necessary for judicial recognition of a common law marriage: (1) express agreement by the parties; (2) by words *in praesenti*; (3) uttered with a view and for the purpose of establishing the relationship of husband and wife. *Manfredi Estate*, 399 Pa. 285, 291, 159 A.2d 697, 700 (1960). And a meretricious relationship, as in the instant case, is presumed to continue until a change to a legal status is proved by clear and convincing evidence. *Pierce v. Pierce*, 355 Pa. 175, 179, 49 A.2d 346, 348 (1946); *Wagner v. Wagner*, 152 Pa.Super.Ct. 4, 8, 30 A.2d 659, 661 (1943).

An examination of the *facts* in the record below leaves me unconvinced that the minor Appellant, Melissa, has support for either the first or the third element set forth above. On the issue of the express agreement between the parties, the record is devoid of any testimony concerning meaningful discussions or conversations between the parties regarding the marriage prior to the ceremony itself. The record *does* establish that Melissa had conversations with the police about her illicit sexual relationship with Christoph and kept those conversations from Christoph right up to the time of the dependency hearing. The record *further* establishes that Christoph had extended conversations with his counsel about marriage but, according to his intended child bride, he only shared with her the magic words necessary to complete the charade. This writer need not reach the serious question of whether an otherwise incorrigible minor possesses the *capacity* to enter into a contract of marriage, since the record does not, in my view, contain any manifestation of a mutual agreement freely entered into between the parties.

I am equally unconvinced that the Appellant can establish by clear and convincing evidence that the words were uttered *with a view and for the purpose of establishing the relationship of husband and wife.* As the majority opinion

cites from the transcript, Christoph indicated that his intention, at the time of the marriage was "to take [Melissa] home to live with me as my wife." Yet, immediately following the 3:00 a. m. incident, Melissa returned to her mother's home, where she stayed without her "new husband" and returned later that morning, not to her "new husband's" abode, but to the home of one of the "witnesses" to the incident. While I have no difficulty in accepting the rule that a contract made by words *in praesenti* may amount to a valid marriage even though not consummated by cohabitation, the reviewing court may examine all the facts in a case in seeking to determine what the true intent and purpose of the parties may have been at the time of the purported marriage agreement.

Where, as here, a thirty-six-year-old man picks up an incorrigible minor girl of tender years at 3:00 a. m. in the morning, after having sought legal advice on means by which he might avoid prosecution for corrupting the morals of a minor, and where, immediately following a ceremony, with witnesses, the parties go their respective ways, it is impossible for me to conclude that the furtive ceremony was entered into with a view and for the purpose of establishing the relationship of husband and wife.

In reaching my conclusion that Appellant has not established by clear and convincing evidence that the words uttered early that morning were pronounced with the sincere and solemn view and for the purpose of establishing the relationship of husband and wife, I have attempted to focus on both the actions and the words of the parties. Every teacher employed to teach in the public schools of this Commonwealth must be a person of good moral character. Public School Code of 1949, Act of March 10, 1949, P.L. 30, art. XI, § 1109, 24 P.S. § 11–1109. Both Melissa's mother and the Erie public school officials had every right to expect that the fiduciary relationship between the school and Melissa's family would not be violated. In fact, however, Christoph used the mandatory attendance provisions of our school laws and his position as a teacher to prey upon one of his

charges, and when ordered to cease and desist from his advances to Melissa, he took the position that what he did with one of his fourteen-year-old pupils after school hours was the proper concern of neither the school officials nor the child's mother. Given his attitude and conception of his relationship to his employer and the young charges entrusted to his care, I am not prepared to conclude that his mere recitation of five or six words, spewed forth while he was fully aware of potential criminal charges, constituted the kind of bona fide purpose or intention to enter into a lawful marriage which this court must recognize.[2] Neither the majority opinion nor the briefs of the multiple appellants refer me to any case law which holds otherwise.

I would agree with the majority that for this court to seek to abolish the doctrine of common law marriage would be an abuse of judicial power. Recognizing the proper role of the legislature in this area, however, does not require us to abdicate our responsibility in deciding cases which reach us *sui generis*. And, as *Gower Estate, supra,* this case is, indeed *sui generis.*

More than forty years ago, this court stated that:

The law of Pennsylvania *recognizes* common law marriages. But they are a fruitful source of perjury and

2. Included in the record transmitted to this court on this appeal is a Petition to Stay Prosecution, filed September 30, 1981 in the lower court on behalf of Edward Christoph. From the Petition, it would appear that a criminal complaint was filed against Christoph on or about August 24, 1981 charging two counts of corruption of minors. A copy of the complaint is attached to the Petition, and alleges, *inter alia,* that Christoph had, on August 18, 1981 received a copy of the lower court's order of August 4, 1981 prohibiting contact between the minor Appellant and Christoph and that, thereafter, Christoph "did [on 8–19–81 & 8–21, 8–22–81] have the aforesaid minor in his vehicle and did have physical contact with her according to the minor. Accused also did attempt, on the 2nd occasion, assist the minor in attempting to flee the jurisdidtion [sic] and leave her foster home placement in Corry, being found together in his vehicle by Corry City Police with personal possessions packed and gathered." The Petition to Stay Prosecution was refused by the Honorable Fred P. Anthony on September 30, 1981. We note that Christoph appeared as a witness, with counsel, at the August 4, 1981 dependency hearing, at the conclusion of which Judge Anthony issued his order barring contact between the parties until further order of court.

fraud, and, in consequence, they are to be *tolerated, not encouraged;* the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife: .... [citation omitted; emphasis in original].

*Commonwealth ex rel. McDermott v. McDermott,* 236 Pa.Super.Ct. 541, 551, 345 A.2d 914, 918 (1975), *quoting Baker v. Mitchell,* 143 Pa.Super.Ct. 50, 54, 17 A.2d 738, 741 (1941).

Whether one person has been *legally* married to another is not a pure question of fact. It is a mixed question of fact and law. *Baker v. Mitchell,* 143 Pa.Super.Ct. at 55, 17 A.2d at 741. We know that a license to marry could not be issued to Melissa on the facts of this case unless a judge of the orphans' court should decide that it is to the best interest of the Appellant and should authorize the clerk of the orphans' court to issue the license. Act of August 22, 1953, P.L. 1344, § 5, 48 P.S. § 1–5(b). I am not prepared to accept that the legislature's preservation of common law marriage in Pennsylvania had included in its purposes the desire to permit Christoph in this case to accomplish, at 3:00 a. m. in the morning, that which he did not, and would not, submit to the courts, whose laws he now seeks to use, in the light of day.

I find the words of Mr. Justice Kephart, speaking for our supreme court in *Stevenson's Estate,* 272 Pa. 291, 296, 116 A. 162, 164 (1922) applicable in the instant case:

"Marriage exists not only for the happiness of the parties, but for the welfare of society. It is the most important engagement that man and woman can enter into. It is the basis of civilized society, of the home, of the family, of sound morals, and of the domestic affection." When it is attempted to establish marriage without the usual formalities, we should examine the professed contract with great scrutiny, and be entirely satisfied this solemn undertaking has been entered into by the voluntary assent of both parties.

It is precisely because I view a marriage without civil or religious ceremony as still valid under the common law of

Pennsylvania that I feel compelled to resist what, in this case, constituted a mockery of this respected institution. The question here is whether we may give effect to mere words *in praesenti* where the surrounding proofs of marriage are, at best, questionable. We are not faced here with the typical situation found in the prior cases involving orphans' court or workmen's compensation disputes where a review of alleged cohabitation or reputation evidence existing over a period of months or years might assist the court in determining the issue. Here, the so-called marriage had existed for less than forty-eight hours before called to the attention of the proper authorities. We therefore must look at the activities of the parties up to the time of the ceremony, and immediately following, to ascertain the purpose of establishing the relationship. When this is done, I have no difficulty in concluding that Melissa and Christoph were never married in the eyes of the law.

The institution of marriage has become fragile enough in modern times without this court accelerating its decline and fall by sanctioning the actions of the parties in this case. Our ancestors could not have conceived that a concept born of the exigencies of pioneer life would one day be used to attempt to thwart the purposes of the Commonwealth in preserving the unity of the family whenever possible and in providing for the care, protection, and wholesome mental and physical development of children. The Juvenile Act, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 6301(b).

In this case, the distinguished lower court judge had before him a petition for dependency arising from the alleged incorrigibility of the minor Appellant. The record is clear that Appellant committed specific acts of habitual disobedience of the reasonable and lawful commands of her mother and her aunt. The lower court found her to be in need of care, treatment or supervision.

But for Appellant's final act of disobedience involving her early morning flight and subsequent return to her mother's home, this case would not be before this court on appeal.

The alleged marriage was raised as a bar to the court's authority to proceed with the dependency petition. It was therefore incumbent upon the minor respondent to establish through clear and convincing evidence that *all* of the elements of a valid common law marriage were present. While the lower court may have unnecessarily focused on *Christoph's* intent, which the lower court found to be fraudulent, I cannot say that the court abused its discretion in failing to find a valid marriage which might have thereby prevented the court from proceeding further. In my view, the facts before the lower court amply support a finding that the purpose of the surreptitious ceremony was something other than to establish the solemn and permanent relationship of husband and wife. The marriage, which from the record does not appear to have been confirmed by cohabitation, is void. Melissa and Christoph were never married in the eyes of the law.

The order of the lower court adjudging the minor Appellant to be dependent and further prohibiting contact in any manner between Appellant and Edward Christoph until further order of the lower court should be affirmed.